[No. H026515. Sixth Dist. Dec. 14, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
CARMELITA VIRAY, Defendant and Appellant.

## COUNSEL

Lauretta Marie Oravitz-Komlos, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Gregg E. Zywicke and Mark S. Howell, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**RUSHING, P. J.**—Defendant Carmelita Viray was convicted of financial abuse of an elder (Pen. Code, § 368, subd. (e)) after the court, sitting without a jury, found that she attempted to steal a house from her aunt by duping her into signing a deed the aunt believed would transfer a different property. On appeal defendant contends that the prosecutor violated her Sixth Amendment right to counsel and engaged in extreme misconduct by interrogating her at length on the morning of her arraignment. We hold that while the interrogation did violate her right to counsel, its admission in evidence cannot be charged as error because no objection was raised below. We also hold that, assuming the interrogation may be viewed as prosecutorial misconduct, the present record does not reflect the level of egregiousness necessary to justify outright dismissal of the charges. Nor does the admission of the fruits of the interrogation justify reversal on the basis of ineffective assistance of counsel, because it is impossible to conclude on the face of this record that defense counsel lacked a tactical reason for failing to object at trial. We therefore find no reversible error in defendant's conviction. However, we reverse, for want of substantial evidence, an order requiring defendant to reimburse the public defender's office for costs assertedly incurred in representing her.

### BACKGROUND

Defendant's aunt, Olgaria Watkins, owned three adjacent lots in Seaside. Two of the lots (Nos. 2679 and 2681) were occupied by Mrs. Watkins's own house; we will refer to them collectively as "the house." The third lot (No. 2683) was occupied by a rundown structure sometimes described in the record as a "shack."

Defendant, who lived near San Diego with her husband, visited her aunt several times a year, and on some number of occasions stayed in the Seaside area to assist her aunt through periods of illness. At some point Mrs. Watkins formed the intent to give one of the properties to defendant. According to Mrs. Watkins, her intent was to deed the shack to defendant in the expectation that defendant would fix or replace it, move in, and thus live conveniently nearby. Defendant testified, however, that the intent was for her to receive the house.

Presumably for the purpose of facilitating the intended conveyance, Mrs. Watkins gave defendant copies of her existing deeds to both properties. Defendant prepared a new deed which, by its terms, conveyed the house to her. A neighbor reviewed the deed at the request of Mrs. Watkins and noted that the tax number referred to the house and not the shack. The deed was modified in defendant's presence so that it contained the tax number for the shack. However, the property description, which was the legally operative language for conveyancing purposes, continued to refer to the house. At some point the deed was further modified to contain the tax numbers for both properties. Mrs. Watkins, who was then 85 or 86 years of age, signed the deed, thus conveying the house to defendant.

About a year later, Mrs. Watkins engaged an estate planning attorney who, upon investigation, told her that title to the house had passed to defendant. The attorney testified at trial that when this fact was initially conveyed to defendant, she stated that the intent had been only to convey the shack. He wrote to her on September 30, 2002, enclosing a quitclaim deed by which she could convey the house back to her aunt. Defendant responded by telephone, saying that she would not sign the quitclaim deed unless her aunt executed a new deed conveying the shack to her. When the attorney insisted on settling title to the house first, defendant refused to execute the conveyance.

This refusal apparently triggered a criminal investigation. In November 2002, defendant was questioned by a police officer, to whom she again expressed a refusal to reconvey the property, stating that her aunt was no longer capable of managing her own affairs. The officer said that defendant expressed surprise when told that Mrs. Watkins had not intended to convey the house. However, the officer did not directly ask, and defendant made no statement, about her own understandings and intentions when her aunt executed the deed.

On December 6, 2004, Deputy District Attorney Joe Buckalew signed a felony complaint alleging that defendant had committed financial abuse of an

elder in violation of Penal Code section 368, subdivision (e),[1] in that defendant "being a caretaker, committed theft and/or embezzlement with respect to the property of an elder or dependent adult, . . . having a value exceeding $400.00," with actual or constructive knowledge that the victim was "an elder adult and/or dependent adult."

The complaint was filed on December 10, 2002, and the matter set for arraignment on January 3, 2003. By a means not apparent from this record, Prosecutor Buckalew arranged with defendant to meet on the morning of her arraignment, but prior thereto, "in one of the offices . . . at the Salinas district attorney's office." At that time she was interrogated at length and in detail by Buckalew and Bob Empasis, an investigator for that office. The interrogation was recorded, and both the recording and a transcript were introduced and admitted into evidence without objection. Although respondent characterizes the "interview" as having been conducted by Empasis, more than half the transcript consists of questioning by "JB," who is identified on the first page as Prosecutor Buckalew.

The transcript does not indicate that defendant was given a warning or admonition of any kind or that any waiver of the right to counsel was solicited or given. At the beginning of the interrogation, Empasis confirmed that defendant had no attorney and asked whether she was "planning to retain one." She replied that she would if authorities "pursue[d]" the matter, but asserted that she had brought papers showing that her aunt had given her the property. Empasis told her, "[W]ell, that's why we're here. We're just gonna kinda go through this to kinda determine which way we want to go with this." During the interview defendant insisted that her aunt had intended to convey the house to her, and perhaps to convey both properties, and that she had no intention of undoing the conveyance. She brought her originals of certain documents, including the deed in question, which Empasis kept, telling defendant, "[T]hey'll be safe with me." These documents were ultimately admitted into evidence without objection.

At 1:30 that same afternoon, defendant was arraigned on the complaint and the public defender was appointed to represent her. The court imposed a $25 registration fee payable within 30 days and added, "The Court may assess additional fees at the end of the case to reimburse the county for the services of the public defender." So far as the record shows, this is the only notice defendant ever received that such an order might be made.

The matter was called for trial on June 9, 2003. At the outset both parties waived jury trial. The matter was prosecuted by Buckalew, who called

---

[1] Except as otherwise indicated, all further statutory references are to the Penal Code.

investigator and fellow interrogator Empasis as his second witness. His testimony served primarily to authenticate the documents defendant had brought to the interrogation, and the tape recording of the interrogation, to which the court later listened in chambers.

The court ultimately found defendant guilty as charged. It concluded that she had deliberately presented her aunt with a deed for the house while telling her it was a deed for the shack, and had thereafter kept a low profile to avoid discovery while Mrs. Watkins was still alive, a plan that was foiled when Mrs. Watkins engaged an estate planning attorney. "Even then [defendant] attempted to mislead [the attorney]," the court observed, "asserting that she had been given title to the lot; not the house . . . . It was only when her deception was uncovered by [the attorney] that she changed her story and said that Mrs. Watkins had intended all along to give her not only the house but the smaller parcel as well. I found her testimony to be not credible . . . ."

Pending sentencing, the court ordered defendant "to refrain from signing or encumbering the property in any fashion," and added that a reconveyance of the house to Mrs. Watkins would "have a very significant positive effect on the sentence that you receive." As of the time of sentencing, however, defendant had not reconveyed the house, and the court continued the matter while soliciting briefing on the question whether it had the power to order her to do so, or to effect reconveyance by other means. At the continued sentencing hearing, colloquy on this subject led to the statement by defense counsel that defendant "does tell me she does not intend to return the property." At that point defendant herself volunteered, "If the judgment is negative, I will appeal. [¶] . . . [¶] My aunt grant me the property in good faith, and so—because I'm her niece. I've been helping her for a long time since her husband passed away. . . . I cannot refund the property, because she give it to me in good faith, and . . . I give her everything. She grant me the property." After explaining to defendant that it intended to pronounce a sentence that could result in her imprisonment if she failed to make restitution, the court ordered defendant placed on three years' probation subject to the condition, among others, that she pay Mrs. Watkins the fair market value of the property. The court declared that defendant could satisfy this condition by conveying the property back to Mrs. Watkins.[2]

Near the end of the hearing defense counsel, who had been largely silent, stated, "We're asking the Court to assess attorney's fees." Counsel referred to a written request seeking $9,200 in fees. After reviewing the request, the

---

[2] The clerk's transcript includes minutes of a hearing on October 30, 2003—after this appeal was filed—indicating that by that time, defendant had executed a deed conveying the house back to Mrs. Watkins.

court ordered defendant "to reimburse the county for the public defender's fees . . . in the sum of $9,200 . . . as of July the 29th."

DISCUSSION

I. *Massiah Error*

A. *Time of Attachment of Right to Counsel*

■ Defendant contends that she "was denied her basic constitutional right to the assistance of counsel at a critical stage in the prosecution when she was interviewed by a deputy district attorney who had already filed criminal charges against her." Her point is not that the prosecutor violated her rights under *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602], by subjecting her to custodial interrogation without adequate warnings. Rather she contends that the interrogation violated *Massiah v. United States* (1964) 377 U.S 201, 206 [12 L.Ed.2d 246, 84 S.Ct. 1199] (*Massiah*), which holds that the government violates a defendant's Sixth Amendment right to counsel when it introduces into evidence incriminating statements deliberately elicited from the defendant by agents of the state, outside the presence of counsel, after the commencement of criminal proceedings. Defendant contends that because the prosecutor had already filed a criminal complaint against her, he was prohibited by *Massiah* from interrogating her, and that the fruits of her interrogation in violation of that prohibition should have been excluded from evidence.

■ Several California cases support the proposition that the right to counsel attaches, and *Massiah*'s prohibition against interrogation takes effect, at the time a criminal complaint is filed. (*People v. Engert* (1987) 193 Cal.App.3d 1518, 1525 [239 Cal.Rptr. 169]; *People v. Lebell* (1979) 89 Cal.App.3d 772, 778 [152 Cal.Rptr. 840]; *People v. Wader* (1993) 5 Cal.4th 610, 653–654 [20 Cal.Rptr.2d 788, 854 P.2d 80] [complaint charging capital murder initiated "adversary judicial criminal proceedings" for purposes of capital charges, but defendant effectively waived attorney rather than invoking right]; see *People v. Reese* (1981) 121 Cal.App.3d 606, 611 [175 Cal.Rptr. 214] [defendant was entitled to counsel at lineup conducted after complaint filed but before arraignment].) Respondent contends that such cases do not bind us, and are mistaken on this point. We acknowledge that none of them is binding in the strictest sense of stare decisis. We also recognize that some of them are not entirely above criticism.[3] However we

---

[3] Respondent asserts quite colorably that *People v. Reese, supra,* 121 Cal.App.3d at page 611, mistakenly equated California procedure with the Illinois procedure held to trigger the right to counsel in *Moore v. Illinois* (1977) 434 U.S. 220 [54 L.Ed.2d 424, 98 S.Ct. 458]. Respondent also notes that one of the decisions cited in some of the foregoing cases was later

believe they are correct insofar as they conclude that the typical California criminal prosecution commences, for purposes of the rule of *Massiah*, no later than the point at which the prosecutor files a criminal complaint.

■ Given 50-plus jurisdictions, each with its peculiar rules of criminal procedure, the determination of when the protections of *Massiah* attach may be the most difficult problem posed by that case. In federal courts, as in *Massiah* itself, the prohibition typically takes effect upon *indictment.* (*Massiah, supra,* 377 U.S. at p. 206.) But many states, including California, provide methods of prosecution not requiring an indictment. Cases following *Massiah* have suggested a variety of principles or formulas for determining at what point under a state's criminal procedures its agents are precluded by the Sixth Amendment from interrogating the defendant. In *Kirby v. Illinois* (1972) 406 U.S. 682, 690 [32 L.Ed.2d 411, 92 S.Ct. 1877], the court wrote that the right to counsel is "historically and rationally applicable only after the onset of formal prosecutorial proceedings." Elsewhere the court said that the right "attaches only at or after the time that adversary judicial proceedings have been initiated against" the defendant. (*Id.* at p. 688.) "The initiation of judicial criminal proceedings," the court elaborated, "is far from a mere formalism. It is the starting point of our whole system of adversary criminal justice. For it is only then that the *government has committed itself to prosecute,* and only then that the *adverse positions of government and defendant have solidified.* It is then that a *defendant finds himself faced with the prosecutorial forces* of organized society, and immersed in the intricacies of substantive and procedural criminal law. It is this point, therefore, that marks the commencement of the 'criminal prosecutions' to which alone the explicit guarantees of the Sixth Amendment are applicable. [Citations.]" (*Id.* at pp. 689–690, italics added, fn. omitted; see U.S. Const., 6th Amend. ["In all *criminal prosecutions,* the *accused* shall enjoy the right . . . to have the assistance of counsel for his defense" (italics added)].)

■ In *Moran v. Burbine* (1986) 475 U.S. 412, 431 [89 L.Ed.2d 410, 106 S.Ct. 1135], the court construed earlier decisions to mean that "the Sixth Amendment right to counsel does not attach until after the initiation of formal charges." The court explained that the purpose of the right "is to assure that in any 'criminal [prosecution],' [citation], *the accused shall not be left to his own devices in facing the ' "prosecutorial forces of organized society." '* [Citations.] By its very terms, [the right] becomes applicable only when the government's role *shifts from investigation to accusation.* For it is only then that the assistance of one versed in the 'intricacies . . . of law,' [citation], is

described as resting on "flawed reasoning." (*People v. Martinez* (2000) 22 Cal.4th 750, 763 [94 Cal.Rptr.2d 381, 996 P.2d 32], describing *People v. Hannon* (1977) 19 Cal.3d 588 [138 Cal.Rptr. 885, 564 P.2d 1203].) The "flaw," however, concerned the interpretation of federal authorities on a point of minimal relevance here, i.e., the point at which the Sixth Amendment right to a *speedy trial* is triggered.

**1196**

needed to assure that the prosecution's case encounters 'the crucible of meaningful adversarial testing.' [Citation.]" (*Id.* at p. 430, italics added.)

In light of these formulae and principles it is difficult to discern how the filing of a felony complaint by a California prosecutor can *fail* to trigger *Massiah*'s protection against uncounseled interrogation. In the complaint filed here, the state formally accused defendant of "committ[ing] theft and/or embezzlement" on a stated date under stated circumstances. The complaint identified her as "defendant" and Prosecutor Buckalew, who signed it, as a Deputy District Attorney of the County of Monterey, "Attorney[] for Plaintiff . . . The People of the State of California." Surely such a pleading is a "formal charge[]" (*Moran v. Burbine, supra,* 475 U.S. at p. 431) in any conceivable sense of that term. Indeed, a complaint is defined by statute (§ 691, subd. (c)) as an " 'accusatory pleading' "—a phrase synonymous, for all practical purposes, with "formal charge."[4] On its face the complaint marks the initiation of "formal prosecutorial proceedings." (*Kirby v. Illinois, supra,* 406 U.S. at p. 690.)

The filing of a complaint also marks the onset of "adversary judicial proceedings" as that phrase was apparently intended in *Kirby v. Illinois, supra,* 406 U.S. at page 688. Under state law, it triggers a duty on the part of authorities to bring the accused "without unnecessary delay, . . . before a magistrate," who must provide the defendant with a copy of the complaint and advise her of the right to counsel. (§ 859.) If counsel is present, the magistrate reads the charges and receives the defendant's plea. (§ 859a.) It is true that this "arraignment on the complaint" (§§ 1050, subd. (k), 1510; *People v. Martinez, supra,* 22 Cal.4th at p. 768, fn. 1) will typically be followed by an eventual "arraignment on the information" (§ 987.1; *People v. Crayton* (2002) 28 Cal.4th 346, 350, 360 [121 Cal.Rptr.2d 580, 48 P.3d 1136]), but that does not reduce the first proceeding to an inconsequential ritual. On the contrary, the defendant may, and many defendants do, *plead guilty* to the complaint, whereupon the magistrate certifies the matter for sentencing. (§§ 859a, 806.) In addition, most facial defects in the complaint must be challenged at the arraignment, or within seven days thereafter, or they are waived. (§ 1003; Cal. Rules of Court, rule 4.110(3); 4 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Pretrial Proceedings, § 252, p. 461.)

Respondent contends that the commencement of prosecution, for Sixth Amendment purposes, occurs not with the filing of the complaint, but at the arraignment on that pleading. This contention would be more colorable if not for the fact that in California, the filing of a felony complaint makes

---

[4] "The words 'accusatory pleading' include an indictment, an information, an accusation, and a complaint." (§ 691, subd. (c).)

arraignment virtually inevitable. Up until the moment the complaint is filed, the prosecutor possesses a broad and exclusive discretion to decide what, whom, and whether to prosecute. (See *People v. Eubanks* (1996) 14 Cal.4th 580, 588–589 [59 Cal.Rptr.2d 200, 927 P.2d 310], quoting *Dix v. Superior Court* (1991) 53 Cal.3d 442, 451 [279 Cal.Rptr. 834, 807 P.2d 1063] [public prosecutor " 'ordinarily has sole discretion to determine whom to charge, what charges to file and pursue, and what punishment to seek' "].) In former times the prosecutor retained this prerogative throughout the proceeding under the rubric of nolle prosequi, i.e., the power to unilaterally abandon a prosecution. But that power was abolished in this state a century and a half ago. (§ 1386; Stats. 1851, ch. 29, § 598, p. 279.) A criminal prosecution, once filed, can now be dismissed only by a magistrate or judge on a finding that dismissal is "in furtherance of justice." (§ 1385, subd. (a).) If dismissal is sought by the prosecutor, he or she must "state the specific reasons for the dismissal in open court, on the record." (§ 1192.6, subd. (b).) This restriction extends explicitly to the "dismissal of a charge in the complaint" in a "felony case." (*Ibid.*; see *People v. Konow* (2004) 32 Cal.4th 995, 1021 [12 Cal.Rptr.3d 301, 88 P.3d 36] [magistrate erred prejudicially by failing to consider defense suggestion that complaint be dismissed in interests of justice].)

Under these statutes, the filing of a complaint divests the prosecutor of the power to unilaterally forgo prosecution. "Once a complaint is filed and the jurisdiction of the court or magistrate invoked, the power to dismiss is vested in the judge or magistrate. At that point the prosecution may only move the court for a dismissal. The court is not required to grant such motion." (*People v. Municipal Court (Pellegrino)* (1972) 27 Cal.App.3d 193, 200 [103 Cal.Rptr. 645] (*Pellegrino*).) Consequently, by filing a complaint the prosecutor, in a wholly concrete and practical sense, "commit[s] [the state] to prosecute." (*Kirby v. Illinois, supra,* 406 U.S. at p. 689.) The complaint unconditionally commences an adversarial criminal process for purposes of *Massiah.* (See *People v. Wader, supra,* 5 Cal.4th at pp. 653–654.)

It appears equally clear that by the time the prosecutor files a complaint, the government's role has "shift[ed] from investigation to accusation." (*Moran v. Burbine, supra,* 475 U.S. at p. 430.) The complaint itself *is* an accusation—not, as respondent seems to imply, some kind of feint, placeholder, or preview. Some degree of investigation undoubtedly continues after the complaint is filed; indeed it may go on until the parties rest their cases at trial, and sometimes beyond. But the complaint's filing ends the phase during which the prosecutor might yet summon all the suspects into the parlor and, like Hercule Poirot, accuse one of them. The complaint *is* that accusation. With its filing, the other suspects, if any, may go their separate ways, while the accused remains behind to confront the organized prosecutorial power of the state. To be sure, the process can yet be checked, the state's power

directed elsewhere—but only with judicial approval. Certainly things have progressed beyond the point at which the state's primary focus can still be viewed as "investigation."[5]

Nor do we have any difficulty in concluding that at the time of her "interview" defendant "f[ound] h[er]self faced with the prosecutorial forces of organized society and immersed in the intricacies of substantive and procedural criminal law." (*Kirby v. Illinois, supra,* 406 U.S. at p. 689; see *Moran v. Burbine, supra,* 475 U.S. at p. 430.) First, the complaint itself may be seen as a formal embodiment or totem of the "prosecutorial forces of organized society"; many laypersons would find such a document unintelligible, and few would understand its implications without advice concerning the "intricacies of . . . criminal law." Ordinarily the filing of a complaint will require no response from the defendant until arraignment, such that the right to counsel may be academic until then.[6] But this generalization flies out the window where, as here, the prosecutor chooses to interrogate the defendant after filing a complaint but prior to arraignment. The defendant is at that moment, and in every sense, "faced with the prosecutorial forces of organized society and immersed in the intricacies of substantive and procedural criminal law." (*Kirby v. Illinois, supra,* 406 U.S. at p. 689; see *Moran v. Burbine, supra,* 475 U.S. at p. 430.) Indeed the moment of confrontation can be said to occur—certainly the need for legal counsel arises—when the prosecutor *suggests* (or requests or demands) that the defendant submit to such an "interview." Without the advice of one versed in criminal law, the defendant is unlikely to realize that she is under no obligation to submit to such interrogation, and that doing so is unlikely to serve her best interests. To suggest that she is not at that moment faced with the prosecutorial forces of organized society is to indulge in fantasy.

We conclude that by every standard and every discernible guideline in the leading cases, the prosecution of defendant commenced when the prosecutor filed the complaint or, at the latest, when the prosecutor, having done so, secured an "interview." It follows inexorably that the right to counsel

---

[5] Here investigator Empasis conveyed the impression to defendant that the matter was still under investigation, stating that "why we're here" was to "kinda go through this to kinda determine which way we want to go with this." We find it disingenuous, to say the least, to suggest to an unrepresented defendant that whether to pursue criminal charges has not yet been determined when the charges have in fact been filed and cannot be abandoned except with judicial approval.

[6] As we have noted, facial defects in the pleading must be raised promptly or they are waived. (4 Witkin & Epstein, *supra,* Pretrial Proceedings, § 252, p. 461.) Although the statute requires them to be asserted *at arraignment* unless otherwise ordered (§ 1003), a rule of court allows them to be raised by demurrer within seven days *after* arraignment (Cal. Rules of Court, rule 4.110(3).) This presumably reflects an awareness both that counsel is typically appointed at arraignment, and that some study may be required before the facial validity of the pleading can be determined.

attached at that moment and that any statements thereafter elicited from defendant by the prosecution were objectionable on grounds that they were procured in violation of her Sixth Amendment right to counsel.

Respondent asserts that the filing of a complaint does not commence a prosecution because it does not vest any court with jurisdiction to *try* the defendant; only the information (or an indictment) can empower the court to conduct a trial. None of the cases we have studied suggests that the right to counsel depends on the technical invocation of jurisdiction to try the defendant. Respondent cites *People v. Martinez, supra,* 22 Cal.4th at page 764, which held that a defendant's right to a *speedy trial* is only triggered by the filing of a "formal accusation upon which [he or she] may be brought to trial," and that a felony complaint is not such a pleading. But cases declaring what constitutes a " 'formal charge' " (*id.* at p. 763) for *speedy trial* purposes do not define the commencement of prosecution for purposes of the right to counsel. The United States Supreme Court has declared that attempts to draw such parallels may be "inapt" because the two rights "protect different interests." (*United States v. Gouveia* (1984) 467 U.S. 180, 190 [81 L.Ed.2d 146, 104 S.Ct. 2292] (*Gouveia*).) "While the right to counsel exists to protect the accused during trial-type confrontations with the prosecutor, the speedy trial right exists primarily to protect an individual's liberty interest, 'to minimize the possibility of lengthy incarceration prior to trial, to reduce the lesser, but nevertheless substantial, impairment of liberty imposed on an accused while released on bail, and to shorten the disruption of life caused by arrest and the presence of unresolved criminal charges.' [Citations.]" (*Ibid.*) Thus, while an official action may resemble an arrest for speedy trial purposes, that resemblance is "not relevant to a proper determination of when the right to counsel attaches." (*Ibid.,* fn. omitted.)

Here of course the interrogation of defendant was precisely a "trial-type confrontation[] with the prosecutor." (*Gouveia, supra,* 467 U.S. at p. 190.) It amounted to a deposition of the accused by the prosecuting attorney. The fact that the complaint was not a "formal charge" for speedy trial purposes has no tendency to detract from our conclusion that the prosecution of defendant had commenced when the challenged statements were elicited.

Similarly, respondent cites a statute providing that "[f]or the purpose of this chapter"—i.e., the *statute of limitations*—an action is commenced when an indictment or information is filed. (§ 804, subd. (a).) By its own terms that statute is inapplicable to the question before us. (See *People v. Wheelock* (2004) 117 Cal.App.4th 561, 565–566 [11 Cal.Rptr.3d 796].) Nor does respondent offer any reason to suppose that the law governing limitations can or should be engrafted onto the constitutional jurisprudence governing the right to counsel. Respondent seeks to draw support from article I, section 14

of the California Constitution, which states that "[f]elonies shall be prosecuted . . . either by indictment or, after examination and commitment by a magistrate, by information." Similarly, section 737 provides that, with an exception not pertinent here, "[a]ll felonies shall be prosecuted by indictment or information." Respondent overlooks the immediately succeeding statute, which states, "Before an information is filed there must be a preliminary examination of the case against the defendant and an order holding him to answer . . . . The proceeding for a preliminary examination *must be commenced by written complaint*, as provided elsewhere in this code." (§ 738, italics added.) This requirement is reiterated and enlarged upon by section 806.[7] Thus, while the provisions cited by respondent indeed condition the prosecutor's power to seek a conviction upon the securing of an information or indictment, those overlooked by respondent condition the filing of an information on the filing of a complaint. Respondent thus solves the riddle of the chicken and the egg by simply ignoring the egg.

■ Moreover, if respondent's premise were accepted it would prove too much, for it would mean that the right to counsel only attaches upon the filing of an information, i.e., *after* the preliminary hearing. It is settled that a defendant is entitled to counsel not only at the preliminary hearing, but at the arraignment on the complaint. (*Michigan v. Jackson* (1986) 475 U.S. 625, 629 [89 L.Ed.2d 631, 106 S.Ct. 1404], quoting *Gouveia, supra*, 467 U.S. at pp. 187, 188 [Michigan arraignment "signal[ed] 'the initiation of adversary judicial proceedings' and thus the attachment of the Sixth Amendment"].) Thus even if an information "commences" the prosecution for some purposes under California law—a point not established by the cited statutes—it could not be given that same effect for purposes of the federal right to counsel.

Perhaps the most intriguing of respondent's arguments is that the filing of a felony complaint does not commence a criminal prosecution because such a pleading is not necessarily a product of the public prosecutor, but may be generated by anyone.[8] The implication is that if a complaint were viewed as the commencement of a prosecution, it would mean that anyone could

---

[7] "A proceeding for the examination before a magistrate of a person on a charge of a felony must be commenced by written complaint under oath subscribed by the complainant and filed with the magistrate. Such complaint may be verified on information and belief. When the complaint is used as a pleading to which the defendant pleads guilty under Section 859a of this code, the complaint shall contain the same allegations, including the charge of prior conviction or convictions of crime, as are required for indictments and informations and, wherever applicable, shall be construed and shall have substantially the same effect as provided in this code for indictments and informations." (§ 806.)

[8] The argument may have been suggested by the fact that in jurisdictions where the filing of a complaint has been held *not* to trigger the right to counsel, the complaint has often been filed by someone other than a prosecutor. (E.g., *Moore v. Illinois, supra*, 434 U.S. at p. 228 [although prosecution was commenced under Illinois law by filing of victim's complaint in court, " 'adversary judicial criminal proceedings' " only commenced with ensuing preliminary

commence a prosecution. The implied argument culminates in the conclusion that since the private initiation of prosecutions would raise a number of difficulties and perplexities, the filing of a complaint should not be viewed as the commencement of prosecution.[9]

Respondent relies primarily upon section 959, which states, "The accusatory pleading is sufficient if it can be understood therefrom: [¶] . . . [¶] 3. If a complaint, that it is made and subscribed by some natural person and sworn to before some officer entitled to administer oaths." (§ 959, subd. 3.) In contrast, respondent notes, an information must be "subscribed and presented to the court by the district attorney of the county in which the court was held." (§ 959, subd. 2.) Based on this divergence, respondent asserts that a complaint, unlike an information, may be filed without prosecutorial participation. According to respondent, "the government may not even [be] involved in the preparation, investigation, and filing of [a] felony complaint."

This argument runs aground on authority, not cited by respondent, directly contradicting the key premise that a private person may file a legally effective criminal complaint without the involvement of the public prosecutor. In *Pellegrino, supra*, 27 Cal.App.3d 193, the district attorney brought charges against two participants in an altercation. (*Id.* at p. 196.) When the prosecutor refused to file charges against a third person (apparently the complaining

hearing]; *U. S. v. Pace* (9th Cir. 1987) 833 F.2d 1307, 1312, quoting *United States v. Duvall* (2d Cir. 1976) 537 F.2d 15, 22 [right to counsel not triggered by FBI agents' filing of complaint and arrest of defendant; under federal law, " 'The principal function of a complaint "is as a basis for an application for an arrest warrant." ' "].) As we have already noted, and as will be further seen below, the complaint plays a larger role in California felony prosecutions than it apparently does in many other jurisdictions.

[9] In this view the complaint would serve the ancient function of *presentment*, i.e., "accus-[ing] persons of crime before the justices of the King." (Kennedy & Briggs, *Historical and Legal Aspects of the California Grand Jury System* (1955) 43 Cal. L.Rev. 251, 253.) The term "presentment" apparently refers back to the even earlier practice of *frankpledge*, under which, if a man enrolled in a *tithing* were wanted by authorities, the other nine members of the tithing were obliged to physically deliver—i.e., to present—the accused for trial. (*Ibid.*) The modern grand jury was arguably born at the Assize of Clarendon of 1166, at which Henry II expanded this concept by requiring specified numbers of the " 'more lawful men' " to state on oath "whether in their hundred or in their vill there is any man accused or publicly known as a robber or murderer or thief, or any one who has been a receiver of robbers or murderers or thieves, since the lord king has been king." (*Ibid.*) The novelty of this decree was that it required the identification of "persons suspected of crime rather than presenting only those who had previously been accused." (*Ibid.*)

Despite this expansion beyond the original meaning, the term "presentment" continued to apply to the accusation of suspected criminals by other citizens, particularly in reference to criminal grand jury proceedings. (See U.S. Const., 5th Amend. ["No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury"]; Pen. Code, § 911 [grand jury oath to " 'diligently inquire into, and true presentment make, of all public offenses against the people of this state, committed or triable within this county, of which the grand jury shall have or can obtain legal evidence' "].)

witness in the matter), one of the defense attorneys persuaded the presiding judge of the municipal court to appoint him as " 'special prosecutor' " to pursue charges as stated in complaints signed by his client. (*Id.* at pp. 196–197.) The superior court issued a writ directing that the appointment be vacated, and suggesting that the prosecutor move to dismiss the complaints if, upon reexamining the matter, he deemed such action appropriate. (*Id.* at p. 198.)

The reviewing court sustained the superior court's annulment of the appointment order but went further, declaring that the complaints, having been privately prepared and filed without the approval of the public prosecutor, were "nullities," as to which the municipal court lacked any power "except to dismiss." (*Pellegrino, supra,* 27 Cal.App.3d at p. 206.) The court squarely held that California law does not empower private citizens to file criminal complaints and thereby trigger a criminal prosecution without the concurrence, approval, or authorization of the public prosecutor. (*Id.* at p. 206; see *id.* at p. 199.)

In reaching this conclusion the court acknowledged that a "literal reading" (*Pellegrino, supra,* 27 Cal.App.3d at p. 201) of sections 740 and 806 could suggest the proposition urged here by respondent, i.e., "that any person could, without approval of the district attorney, institute a criminal proceeding, either felony or misdemeanor, against another by the filing of a sworn complaint with a magistrate or municipal court." (*Pellegrino, supra,* 27 Cal.App.3d at p. 201.) On the other hand, the court observed that " 'all prosecutions' " are to be conducted " 'in the[] name and *by the*[] *authority*' " of the people of this state. (*Id.* at p. 200, quoting former Cal. Const., art. VI, § 20; see now Gov. Code, § 100.) Moreover, the Legislature had vested exclusive authority to conduct such prosecutions in the "public prosecutor," meaning, "except as otherwise provided by law," the district attorney, who "within his or her discretion shall initiate and conduct on behalf of the people all prosecutions for public offenses." (Gov. Code, § 26500; see Cal. Const., art. V, § 13 [empowering Attorney General to assume functions of district attorney "[w]henever in the opinion of the Attorney General any law of the State is not being adequately enforced in any county"]; Gov. Code, § 12550 [to similar effect]). Prior authorities seemed to recognize, "albeit obliquely," that criminal prosecutions require "the district attorney's approval for their institution." (*Pellegrino, supra,* 27 Cal.App.3d at p. 200.)

The court further noted that "the filing of a complaint charging the commission of a public offense is the *critical event* in instituting a criminal prosecution. This is true *even though in the case of a felony the law requires a preliminary hearing,* as a condition precedent to trial in the superior court. (Pen. Code §§ 737 and 783.)" (*Pellegrino, supra,* 27 Cal.App.3d at p. 199, fn. omitted, italics added.) The critical nature of the complaint flows in part from

the abolition of nolle prosequi, by which the Legislature had divested the prosecutor, a member of the executive branch of government, of the power to discontinue a prosecution, and had given that power to the judicial branch. (*Id.* at p. 199.) The court held that if the Legislature were to simultaneously empower "private individuals to institute criminal proceedings without approval of the district attorney," the combined effect would be to "improperly impair[] the discretion of the district attorney and encroach[] upon the executive power in violation of article III, section I of the California Constitution." (*Id.* at p. 204; see *id.* at pp. 201–202.) Thus "the existence of a discretionary power in the district attorney to control the institution of criminal proceedings is a necessary prerequisite to the constitutional validity of the requirement that the district attorney seek court approval for abandoning a prosecution as required by sections 1385 and 1386 of the Penal Code." (*Id.* at p. 204.) In other words, the Legislature might cede to the courts the power to decide to *initiate* a prosecution, or it might cede to them the power to decide to *terminate* a prosecution; but it could not grant them both of these powers without effectively making the prosecutor a functionary of the courts in violation of the separation of powers. This interrelation between the power to initiate prosecutions and the power to discontinue them has been recognized in at least one other jurisdiction, where the courts have justified the private initiation of criminal charges by noting the prosecutor's traditional power to desist from pursuing such charges—a power no longer available to prosecutors in this state. (See *State v. Rollins* (1987) 129 N.H. 684 [533 A.2d 331] ["The common law of this State does not preclude the institution and prosecution of certain criminal complaints by private citizens [citations], although any such prosecution is subject to the authority of the attorney general or the appropriate county attorney to enter *nolle prosequi*"].)

As the *Pellegrino* court further observed, a procedure for private criminal complaints "has the potential for permitting any person in the name of the People of the State of California to redress a personal grievance by way of a criminal prosecution against his adversary." (*Pellegrino, supra*, 27 Cal.App.3d at p. 201.) Indeed, as this case may illustrate, private persons would have the power to trigger felony prosecutions of what would ordinarily be litigated as civil wrongs. The underlying wrong here is of a type far more familiar to civil than criminal courts, and the underlying injury could seemingly be amply redressed by a civil judgment. Even the *public* interest in deterring felonious conduct could have been served to at least some degree by an award of punitive damages. This is not to suggest that the prosecutor should not have filed charges here; that decision rested, as we have emphasized, in his sole discretion. The point is that if the district attorney had *declined* to file charges, then under the regime suggested by respondent any other person—without even claiming an interest sufficient to give them

standing to sue—could have filed a complaint and, by persuading a magistrate that a crime probably had been committed, *forced* the district attorney to pursue it, possibly at the expense of more compelling matters, until a judge agreed to dismiss it. Such a regime would seem calculated to produce a proliferation of criminal charges filed not to vindicate any public interest but to secure tactical advantages, or simply for spite, in the course of ordinary civil controversies.

On a somewhat related point, the *Pellegrino* court concluded that subjecting one citizen to criminal prosecution upon the whim of another citizen would deny the accused due process of law, since "all persons should be protected from having to defend against frivolous prosecutions and . . . one major safeguard against such prosecutions is the function of the district attorney in screening criminal cases prior to instituting a prosecution." (*Pellegrino, supra*, 27 Cal.App.3d at pp. 205–206, fn. omitted.) The court did not entirely foreclose the possibility that the filing of a criminal complaint by a private person might operate to commence a valid prosecution, but held that in order to do so the filing "must be approved, authorized or concurred in by the district attorney before [it is] effective in instituting criminal proceedings against an individual." (*Id.* at p. 206.)

The California Supreme Court appeared to confirm this conception of prosecutorial prerogative in *People v. Eubanks, supra*, 14 Cal.4th 580, where the court held that a victim's contributions to the district attorney's investigative costs could give rise to a disabling conflict of interest. In discussing the independence and impartiality of the office of district attorney, the court wrote, "California law does not authorize private prosecutions. Instead, '[t]he prosecution of criminal offenses on behalf of the People is the sole responsibility of the public prosecutor . . . . [¶] [who] ordinarily has sole discretion to determine whom to charge, what charges to file and pursue, and what punishment to seek. [Citation.] No private citizen, however personally aggrieved, may institute criminal proceedings independently [citation], and the prosecutor's own discretion is not subject to judicial control at the behest of persons other than the accused.' [Citation.]" (*Id.* at pp. 588–589.)

We thus reject the essential premise that the filing of a criminal complaint can be a purely private act subject only to judicial control. We add, however, that even if we accepted this premise, it would not follow that defendant's right to counsel had not attached when she was interrogated here. The complaint against her was in fact prepared and filed by the public prosecutor, not by a private person. By that filing, the prosecutor committed himself to seeking defendant's conviction of a crime, and solidified their respective adversarial positions as accuser and accused. The abstract hypothesis that

such a complaint might be filed without prosecutorial involvement cannot convert the unequivocal bringing of official, formal charges into something less than it is.

Respondent cites federal authorities for the proposition that "the filing of a criminal complaint and the issuance of an arrest warrant do not constitute the initiation of an adverse judicial proceeding" for purposes of the Sixth Amendment right to counsel. The lead case cited is *Beck v. Bowersox* (8th Cir. 2004) 362 F.3d 1095. The question there was whether a Missouri defendant was entitled to federal habeas corpus relief on his claim that state authorities violated his Sixth Amendment rights by taking statements from him after the prosecuting attorney filed a "warrant affidavit" charging him with murder. (*Beck v. Bowersox*, at p. 1101.) Respondent cites the case for its statement that "this court and other circuits have repeatedly held that the right [to counsel] does not attach with an *arrest*, even an arrest preceded by the filing of a *complaint under Rule 3* of the Federal Rules of Criminal Procedure." (*Id.* at p. 1102, italics added, fn. omitted.) This statement was dictum, since no complaint had been filed in that case; the only question was whether an *affidavit seeking the defendant's arrest*, and the arrest itself, constituted the commencement of a criminal prosecution.[10] That distinction is critical because the court's references to "complaints" all assumed a procedural system under which the function of a complaint was merely to secure the defendant's *arrest*. (See *Beck v. Bowersox*, at p. 1102 ["The prosecutor's affidavit in this case, like a federal Rule 3 complaint, was filed solely to obtain a warrant for Beck's arrest"].) Although many of the cases cited there on this point do not clearly disclose the function of the complaint, it appears true as a general matter that in most jurisdictions they serve a similarly limited function. (See 21 Am.Jur.2d (1998) Criminal Law, § 551, pp. 585–586.)

■ In this jurisdiction, in contrast, a complaint does not merely operate to secure a warrant of arrest; indeed it may not have that function at all where, as here, no warrant is sought. But whether it is filed for that purpose or not, in this state it *commits the prosecutor* to pursue a criminal conviction—a commitment from which only a court can grant relief. It thus solidifies the adverse position between the prosecutor and the defendant and marks the commencement of the prosecutorial, as distinct from investigative, phase of the criminal justice process. It follows that at the time of defendant's

---

[10] Further, the *Beck* court was not called upon to decide, and did not actually hold, that the filing of the affidavit did not trigger a right to counsel. Instead the court applied the peculiar standard applicable to federal habeas review of state court convictions, under which the question is not whether a challenged ruling was correct, but whether it was "contrary to [or] an unreasonable application of clearly established Supreme Court precedent." (*Beck v. Bowersox, supra,* 362 F.3d at p. 1102; see *id.* at p. 1100, italics in original, quoting *Williams v. Taylor* (2000) 529 U.S. 362, 410 [146 L.Ed.2d 389, 120 S.Ct. 1495] [" '[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law' "].)

interrogation by the prosecutor, a criminal prosecution had commenced against her for purposes of the Sixth Amendment right to counsel and of *Massiah*'s prohibition against uncounseled questioning.

### B. *Failure to Assert Right*

Respondent contends that even if the right to counsel and the protections of *Massiah* had attached when defendant was interrogated, there was no violation of her Sixth Amendment rights because she "did nothing to *assert* a right to counsel under the Sixth Amendment." (Italics added.) Respondent argues that "[o]nly after the right to counsel has attached *and been asserted*, must the State honor it." (Italics in original.)

This proposition is flatly contrary to existing authority. In support of it respondent cites *Maine v. Moulton* (1985) 474 U.S. 159, 170 [88 L.Ed.2d 481, 106 S.Ct. 477] (*Moulton*), where the court wrote, "Once the right to counsel has attached *and been asserted*, the State must of course honor it." (Italics added, fn. omitted.) Respondent places far too much weight on the italicized phrase. Whatever it was meant to convey, it certainly was *not* meant to limit the rule of *Massiah* to cases in which the defendant has affirmatively claimed the right to counsel. Less than five months after issuing that opinion, the court filed *Michigan v. Jackson, supra,* 475 U.S. 625, where it considered what effect to give an *affirmative waiver* of the Sixth Amendment right to counsel (*id.* at p. 628) *after* the right had attached and been "invoked" by the defendant (*id.* at pp. 626, 635, fn. 9; see *id.* at pp. 638, 641 (dis. opn. of Rehnquist, J.)). The court later described that case as articulating a rule "for deciding whether an accused who has 'asserted' his Sixth Amendment right to counsel has *subsequently waived* that right." (*Michigan v. Harvey* (1990) 494 U.S. 344, 349 [108 L.Ed. 2d 293, 110 S.Ct. 1176], italics added; see *McNeil v. Wisconsin* (1991) 501 U.S. 171, 175 [115 L.Ed.2d 158, 111 S.Ct. 2204], cited in *People v. Wader, supra,* 5 Cal.4th at p. 654 ["once this right to counsel has attached *and has been invoked,* any subsequent waiver during a police-initiated custodial interview is ineffective" (italics added)].)

■ The defendant's express invocation of the right to counsel was relevant in *Moulton* because it triggered a " 'prophylactic rule' " rendering a *subsequent waiver* presumptively invalid. (*Michigan v. Harvey, supra,* 494 U.S. at pp. 349, 350.) But no member of the court suggested that such an invocation was necessary to erect the shield of *Massiah* in the first place. On the contrary, both the majority and the dissent endorsed the proposition that *the Sixth Amendment right to counsel attaches, in the first instance, without*

*any "invocation" whatever.*[11] Thus, in the absence of an affirmative waiver, the concept of "invocation" (or "assertion") has no pertinence to a *Massiah* claim. (Cf. *People v. Wader, supra,* 5 Cal.4th at pp. 653–654 [deputy's interrogation did not violate defendant's Sixth Amendment rights, although those rights had attached upon filing of complaint, where "defendant orally and in writing indicated he wanted to talk about the robberies and did not want a lawyer"].)[12]

Here the prosecutorial interrogators made no apparent effort to advise defendant of her right to counsel or to secure a knowing and intelligent waiver of same. There were no admonitions and nothing resembling a free and voluntary relinquishment of that right. If anything, the interrogators misled defendant by implying that they had not yet decided what to do about her case, when in fact, as we have noted, they had already committed themselves to her prosecution. In these circumstances, her failure to "assert" or "invoke" her right to counsel has no consequence.

■ We conclude that the prosecutor violated defendant's Sixth Amendment right to counsel by interrogating her concerning the subject matter of a felony complaint previously filed against her. Evidence elicited through that

---

[11] Justice Stevens wrote for the majority, "In construing respondents' request for counsel, we do not, of course, suggest that the right to counsel turns on such a request. See *Brewer* v. *Williams* [(2004)] 430 U.S. [387], 404 [51 L.Ed.2d 424, 97 S.Ct. [1232], at 1242] ('[T]he right to counsel does not depend upon a request by the defendant'); *Carnley* v. *Cochran,* 369 U.S. 506, 513 [8 L.Ed.2d 70, 82 S.Ct. 884, 888] (1962) ('[I]t is settled that where the assistance of counsel is a constitutional requisite, the right to be furnished counsel does not depend on a request'). Rather, we construe the defendant's request for counsel as an extremely important fact in considering the validity of a subsequent waiver in response to police-initiated interrogation." *(Michigan v. Jackson, supra,* 475 U.S. at p. 633, fn. 6.)

Writing for the three dissenters, Justice Rehnquist agreed with this principle: "[U]nlike a defendant's 'right to counsel' under *Miranda,* which does not arise until affirmatively invoked by the defendant during custodial interrogation, a defendant's Sixth Amendment right to counsel does not depend at all on whether the defendant has requested counsel. [Citations.]" *(Michigan v. Jackson, supra,* 475 U.S. at p. 641 (dis. opn. of Rehnquist, J.).)

Chief Justice Burger concurred in the judgment without alluding to the point that concerns us here.

[12] An introductory comment in *People v. Slayton* (2001) 26 Cal.4th 1076, 1079 [112 Cal.Rptr.2d 561, 32 P.3d 1073], suggests that the rule of *Massiah* applies only after the Sixth Amendment right to counsel "both attaches and is invoked." The issue in that case was whether the right to counsel, which had clearly attached as to some charges, had also attached as to certain other charges. The reference to invocation was dictum, and presumably not "well-considered dictum" *(People v. McAlpin* (1991) 53 Cal.3d 1289, 1308 [283 Cal.Rptr. 382, 812 P.2d 563]), since, without any supporting discussion or analysis, it diverged from the paramount authority we have just cited. As such it is neither binding nor persuasive. (See 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 947, p. 989.)

interrogation was objectionable, and upon proper objection should have been excluded from the prosecution's case-in-chief.[13]

## II. *Absence of Trial Objection*

### A. *Necessity of Objection*

Defendant did not object in the trial court to the evidence obtained through her interrogation by the prosecutor. The defense failed entirely to raise any issue about the legality of the interrogation or the admissibility of its products. There was ample opportunity to do so, if not by motion in limine or motion to suppress, then when prosecutor Buckalew called investigator Empasis to the stand and questioned him about the "interview" of January 3, 2003. The only defense objection raised during this portion of proceedings was one of vagueness directed to a question whether two documents were "not originals." Nor was there any objection when the prosecution presented the tape and transcript to the court for its review or formally moved them, along with all other prosecution exhibits, into evidence.

Given these facts, it cannot be said that the trial court erred by admitting evidence derived from the "interview." Ordinarily a court cannot commit error in the admission of evidence unless it is called upon to *rule* on an *objection* by a party. (See Evid. Code, § 353, subd. (a).) The court may of course exclude evidence on its own motion, but it will ordinarily do so only if it finds the evidence wasteful of judicial resources because, e.g., it is redundant or irrelevant. (See Evid. Code, §§ 350, 351, 352.) If proffered evidence is relevant, courts will rarely if ever exclude it sua sponte merely because it may fall within some exclusionary rule. For a court to take the initiative in enforcing such rules would tend to interfere with the prerogatives of counsel, who may have tactical reasons for acquiescing in the admission of objectionable evidence. Moreover the task of raising evidentiary objections cannot be placed upon the trial court without imposing a momentous new burden on the judicial system as a whole. It is a fact of judicial life that, whether by design or oversight, parties regularly fail to object to objectionable evidence. To oblige trial courts to police such omissions would threaten a perpetual cycle of trial, appeal, and retrial. It therefore is not, and cannot be, the trial judge's job to parse proffered evidence and decide on its own motion

---

[13] We need not consider whether the evidence might have been admissible for impeachment, since that inquiry bears only on the question whether the failure to object was prejudicial, a point we have not found it necessary to reach. (See *People v. Harper* (1991) 228 Cal.App.3d 843, 853 [279 Cal.Rptr. 204] [not admissible]; *People v. Cribas* (1991) 231 Cal.App.3d 596, 606 [282 Cal.Rptr. 538] [following *Harper*]; but see *People v. Brown* (1996) 42 Cal.App.4th 461, 473–474 [49 Cal.Rptr.2d 652] [rejecting rule of *Cribas* and *Harper* in favor of perceived majority rule admitting such statements for impeachment].)

whether the evidence might fall within one of the many labyrinthine rules of exclusion. Our law places that burden squarely on counsel, where, for a variety of well-tested reasons, it must generally remain.

Although this principle has been codified in the case of evidentiary matters (Evid. Code, §§ 353, 354), it represents a specific application of the general rule that reviewing courts will not consider alleged deficiencies in a judgment or order unless the trial court was given an opportunity to act upon them in the first instance. (See *People v. Roldan* (2005) 35 Cal.4th 646, 736 [27 Cal.Rptr.3d 360, 110 P.3d 289] [*Massiah* claim not preserved for appeal, but also rejected on the merits]; *People v. Carter* (2003) 30 Cal.4th 1166, 1209 [135 Cal.Rptr.2d 553, 70 P.3d 981] [noting, in context of *Massiah* claim, "the general rule that the failure to object is a matter of trial tactics that an appellate court will seldom second-guess"].) Here the trial court clearly could have acted upon the constitutional violation by sustaining a *Massiah* objection and excluding the evidence of defendant's interrogation. Defendant's failure to object deprived it of an opportunity to do so. Any claim of evidentiary error was thus lost, and cannot be entertained on appeal.

Defendant asserts that because the *Massiah* violation "is of constitutional stature," it "could not be waived by . . . trial counsel's failure to make an objection . . . ." This assertion is contrary to the principles we have described and the specific authorities just cited, i.e., *People v. Roldan, supra*, 35 Cal.4th 646, and *People v. Carter, supra,* 30 Cal.4th 1166. Nor is a contrary conclusion suggested by the authority she cites. In *People v. Vera* (1997) 15 Cal.4th 269, 276–277 [62 Cal.Rptr.2d 754, 934 P.2d 1279], the court wrote, "Not all claims of error are prohibited in the absence of a timely objection in the trial court. A defendant is not precluded from raising for the first time on appeal a claim asserting the deprivation of certain fundamental, constitutional rights. [Citations.]" The proposition that "certain" constitutional challenges are preserved without a trial objection hardly establishes that *all* such claims are preserved, or that defendant's claim is preserved. None of the examples cited in *Vera* bears any resemblance to the constitutional-evidentiary issue defendant seeks to raise here. (See *People v. Saunders* (1993) 5 Cal.4th 580, 592, 589, fn. 5 [20 Cal.Rptr.2d 638, 853 P.2d 1093] [plea of once in jeopardy]; *People v. Holmes* (1960) 54 Cal.2d 442, 443–444 [5 Cal.Rptr. 871, 353 P.2d 583], quoting former Cal. Const., art. I, § 7; see now Cal. Const., art. I, § 16 [objection to defective jury waiver]; see also *People v. Superior Court (Marks)* (1991) 1 Cal.4th 56, 77, fn. 20 [2 Cal.Rptr.2d 389, 820 P.2d 613] [former jeopardy].)

Defendant cites *People v. Valladoli* (1996) 13 Cal.4th 590, 606 [54 Cal.Rptr.2d 695, 918 P.2d 999], which also involved a double jeopardy claim. That decision's only bearing on the present analysis is the observation that,

"arguably," a parallel challenge to a statute on facial due process grounds was "also properly raised" despite the failure to assert it in lower courts. (*Ibid.*) A facial challenge to a statute bears even less resemblance to the claim of error here than does a plea of once in jeopardy. Neither the court's lukewarm willingness to address the point nor anything else in the cases cited by defendant supports a blanket rule preserving all constitutional objections whether or not asserted in the trial court. The general rule is squarely to the contrary. (See, e.g., *People v. Brown* (2003) 31 Cal.4th 518, 546 [3 Cal.Rptr.3d 145, 73 P.3d 1137] [various constitutional objections to evidence rejected "at the threshold," "for we find defendant failed to preserve these issues for appeal by failing to object on the state and federal constitutional grounds now asserted"]; *People v. Wader, supra,* 5 Cal.4th at pp. 653–654 [by failing to object to deputy's testimony, defendant failed to preserve issue whether interrogation violated Sixth Amendment]; *People v. Roldan, supra,* 35 Cal.4th at p. 736.) The cases cited by defendant mark *exceptions* to this rule. Defendant offers no reasoned basis for taking this case out of the rule and making another, new, exception.

Next defendant asserts that this court has the inherent power, which she seeks to invoke, to consider any point despite a failure to properly preserve it for appeal. She cites *People v. Williams* (1998) 17 Cal.4th 148, 161–162, footnote 6 [69 Cal.Rptr.2d 917, 948 P.2d 429], where the court observed that the requirement of a predicate trial objection does not ipso facto deprive a reviewing court of "authority in the premises." The court went on, however, to observe that an appellate court *is* "barred" from entertaining a point "when the issue involves the admission (Evid. Code, § 353) or exclusion (*id.,* § 354) of evidence." (*Ibid.*)

Moreover, even if we had discretion to entertain the point, we would decline to exercise it. The requirement of predicate trial objections does not exist to impose forfeitures for their own sake but to coerce parties into litigating cases efficiently and prevent them from withholding objections for tactical reasons. As is discussed below, the present record leaves open the possibility that defense counsel deliberately withheld objection to the evidence in the hope that it would favor the defense. If that is not so, defendant's remedy lies in establishing that she was prejudiced by counsel's putative oversight. (See pt. III., *post.*)

B. *Prosecutorial Misconduct Warranting Dismissal*

Defendant also contends that her interrogation constituted such egregious prosecutorial misconduct that the only appropriate remedy was dismissal. If this were true, reversal would not result in a wasteful retrial but in the final termination of proceedings. In that case, the failure to object below might

well be excused on appeal, since the rationale for requiring predicate trial objections would be largely absent.

However, defendant has provided no persuasive authority for the premise that her interrogation rose to a level warranting such a sanction. We are prepared to accept arguendo that the prosecutor's knowing interrogation of defendant after charging her with a felony may have constituted a species of misconduct. However we are not prepared to hold on this record that it was so egregious as to warrant dismissal. The record does not show that the prosecutor *knew* he was violating defendant's rights under *Massiah*; he may have believed, erroneously but in good faith, that unless defendant had retained counsel there was no impediment to his "interviewing" her before arraignment. Although investigator Empasis made some seemingly disingenuous remarks at the beginning of the interrogation, the record fails to establish that any gross imposition or deception was employed against defendant. Indeed the record is almost entirely silent with respect to events leading up to the interview, the only evidence being Empasis's tentative testimony that he thought it had been arranged by Buckalew.

Nothing here resembles any of the cases cited by defendant, which involve discrete forms of egregious misconduct such as intentionally eliciting inadmissible testimony at trial (*People v. Bonin* (1988) 46 Cal.3d 659, 689 [250 Cal.Rptr. 687, 758 P.2d 1217], overruled on other grounds in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1 [72 Cal.Rptr.2d 656, 952 P.2d 673]), using grand jury questioning to "freeze" the testimony of defense witnesses (*United States v. Fisher* (2d Cir. 1971) 455 F.2d 1101, 1104–1105; *United States v. Gibbons* (10th Cir. 1979) 607 F.2d 1320, 1328), or intentional interference with an *existing* attorney-client relationship (*Barber v. Municipal Court* (1979) 24 Cal.3d 742 [157 Cal.Rptr. 658, 598 P.2d 818]; *United States v. Levy* (3d Cir. 1978) 577 F.2d 200; *Boulas v. Superior Court* (1976) 188 Cal.App.3d 422 [233 Cal.Rptr. 487]).

This is not to say that the present record *precludes* a finding of egregious misconduct—only that it fails to affirmatively support such a finding. A different view might be justified by evidence that, for instance, the prosecutor made a practice of violating *Massiah* as a routine means to obtain improper discovery or foreclose defense strategies or positions. We hold only that the record now before us does not disclose the kind of egregious misconduct that might justify an outright dismissal.

■ Consequently, we find no basis to hold that the claimed violation of defendant's *Massiah* rights can, in and of itself, justify reversal of defendant's conviction.

### III. *Ineffective Assistance of Counsel*

Defendant contends that the deputy public defender who appeared for her at trial rendered ineffective assistance by failing to object to the evidence of her interrogation by Buckalew and Empasis. This is a colorable argument, but cannot be successfully established on direct appeal because the bare appellate record cannot establish that the failure to object lacked a tactical motivation.

■■■ " 'In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was "deficient" because his "representation fell below an objective standard of reasonableness . . . under prevailing professional norms." [Citations.]' " (*In re Harris* (1993) 5 Cal.4th 813, 832–833 [21 Cal.Rptr.2d 373, 855 P.2d 391].) "[T]here is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' [Citation.] Defendant's burden is difficult to carry on direct appeal . . . . ' "Reviewing courts will reverse . . . only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for [his or her] act or omission." ' [Citation.]" (*People v. Lucas* (1995) 12 Cal.4th 415, 437 [48 Cal.Rptr.2d 525, 907 P.2d 373].)

Here it is impossible to say that counsel lacked a tactical reason for failing to seek relief based on the "interview." Counsel may well have concluded that a motion to dismiss on grounds of prosecutorial misconduct would have been denied for want of merit, and would not have otherwise advanced defendant's cause. The failure to seek to exclude evidence of the "interview" is somewhat more difficult to explain, but may have reflected a belief that the interview was consistent with defendant's own version of events and that its admission might incrementally increase the chance that her version would be credited at least to the extent of raising a reasonable doubt about her mental state when she made out the deed underlying the alleged felony.

Defendant asserts on appeal that the interrogation was "devastating" to one of her "viable defenses," i.e., "a mental state defense based on mistake of fact." But while counsel alluded to such a defense in argument, there is no basis to suppose that such a defense was in fact "viable" or, more to the point, available to counsel, particularly in light of circumstantial indications that defendant herself was, or would have been, adamantly opposed to any assertion that the transfer was in any respect inadvertent. She repeatedly insisted that the property had been correctly and effectively deeded to her, even after the court found her guilty and suggested that her sentence might depend on her willingness to return the property to its original owner. Instead of complying with this suggestion, defendant filed a premature notice of appeal in which she asserted that she had committed no crime, that her aunt had deeded her the property "in good faith," that she understood her aunt

wanted the property back, and that she refused to return it. Defendant repeated these contentions at sentencing, stating that she could not "refund" the property because her aunt had "give[n] it to me in good faith" and had "grant[ed] me the property." These contentions cannot readily be reconciled, indeed they appear starkly at odds with, a defense based on mistake, one effect of which would be to deprive defendant of any continuing claim to the property.

It follows that the present record does not permit a reliable inference concerning counsel's reasons for failing to object to the "interview." Since the record cannot establish the lack of a creditable tactical reason, it cannot establish that counsel rendered ineffective assistance. Whether defendant might be able to establish such a claim in a collateral challenge to her conviction is a question not now before us. (Cf. *In re Wilson* (1992) 3 Cal.4th 945, 955–956 [13 Cal.Rptr.2d 269, 838 P.2d 1222] [evidence in habeas corpus proceeding showed that counsel's failure to object rested on misunderstanding of *Massiah*].)

In sum, the prosecutor's interrogation of defendant in violation of her Sixth Amendment right to counsel does not furnish a basis for reversal on this record, whether viewed under the rubric of evidentiary error, prosecutorial misconduct, or ineffective assistance of counsel. For that reason the finding of guilt cannot be disturbed on appeal.

## IV. *Fee Reimbursement Order*

Defendant also contends that the trial court erred by ordering her to reimburse the public defender's office in the amount of $9,200 pursuant to section 987.8.[14] That section empowers the court to order a defendant who has received legal assistance at public expense to reimburse some or all of the county's costs. Defendant objects to the order here on the grounds that (1) the

---

[14] Section 987.8 provides in part as follows:

"(b) In any case in which a defendant is provided legal assistance, either through the public defender or private counsel appointed by the court, upon conclusion of the criminal proceedings in the trial court . . . , the court may, after notice and a hearing, make a determination of the present ability of the defendant to pay all or a portion of the cost thereof. . . .

"(c) In any case . . . in which the defendant, at the conclusion of the case, appears to have sufficient assets to repay, without undue hardship, all or a portion of the cost of the legal assistance provided to him or her, . . . the court shall make a determination of the defendant's ability to pay as provided in subdivision (b), and may, in its discretion, make other orders as provided in that subdivision. [¶] . . . [¶]

"(f) Prior to the furnishing of counsel or legal assistance by the court, the court shall give notice to the defendant that the court may, after a hearing, make a determination of the present ability of the defendant to pay all or a portion of the cost of counsel. The court shall also give notice that, if the court determines that the defendant has the present ability, the court shall

record fails to disclose that she received adequate notice of the hearing at which the court imposed the order; (2) the hearing itself was inadequate in that defendant's position regarding reimbursement was not solicited or otherwise made known; (3) insufficient evidence was adduced to establish that defendant was able to pay the fees; (4) the amount allowed was excessive and unsupported by evidence of the actual cost to the county.

Although we believe each of these contentions is colorable, we need not reach the first two because we find the third and fourth to be meritorious. At the threshold, we must consider respondent's contention that defendant has failed to preserve her challenge to the reimbursement order for appeal because she lodged no predicate objection in the trial court. We recognize that such a view has been adopted by published authority, but we find that authority distinguishable, and do not believe it can be rationally extended to bar objections to an order for reimbursement of *counsel* fees, for the reason that unless the defendant has secured a new, independent attorney when such an order is made, she is effectively *unrepresented* at that time, and cannot be vicariously charged with her erstwhile counsel's failure to object to an order reimbursing his own fees.

The trial court in *People v. Phillips* (1994) 25 Cal.App.4th 62, 67 [30 Cal.Rptr.2d 321], ordered the defendant at sentencing to pay $150 for the services of the public defender, after questioning him about his income. On appeal the defendant complained that the court had failed to give him oral or written notice that a hearing on that issue would take place at sentencing. (*Id.* at pp. 73–74.) In rejecting this argument, the reviewing court noted that the probation report had recommended such an order "if appropriate." (*Id.* at

order him or her to pay all or a part of the cost. The notice shall inform the defendant that the order shall have the same force and effect as a judgment in a civil action and shall be subject to enforcement against the property of the defendant in the same manner as any other money judgment.

"(g) As used in this section: [¶] . . . [¶]

"(2) 'Ability to pay' means the overall capability of the defendant to reimburse the costs, or a portion of the costs, of the legal assistance provided to him or her, and shall include, but not be limited to, all of the following:

"(A) The defendant's present financial position.

"(B) The defendant's reasonably discernible future financial position. In no event shall the court consider a period of more than six months from the date of the hearing for purposes of determining the defendant's reasonably discernible future financial position. Unless the court finds unusual circumstances, a defendant sentenced to state prison shall be determined not to have a reasonably discernible future financial ability to reimburse the costs of his or her defense.

"(C) The likelihood that the defendant shall be able to obtain employment within a six-month period from the date of the hearing.

"(D) Any other factor or factors which may bear upon the defendant's financial capability to reimburse the county for the costs of the legal assistance provided to the defendant."

p. 66.) The court characterized the report as having included fee reimbursement among its "recommendations for issues which should be considered at the sentencing hearing." (*Id.* at p. 74.) "Under such circumstances," the court continued, "we see no reason why such a recommendation should not be viewed as placing a defendant on notice that he or she should be prepared to proceed with the ability-to-pay hearing at time of sentencing." (*Id.* at pp. 74–75.) The court also concluded, however, that the defendant had lost any objection to notice through the silence of the defendant's attorney when the order was made: "Counsel did not offer any objection to the court's order for reimbursement on grounds of notice, lack of preparation, or lack of an opportunity to present evidence. The absence of any such objection indicates that defendant was not surprised by the court's consideration of his financial status and the subsequent order for reimbursement. (See *People v. Brown* (1970) 13 Cal.App.3d 876, 882 [91 Cal.Rptr. 904] [claim of inadequate notice is not viable where an accused who is represented by counsel participates in hearing].)" (*Id.* at p. 75.)

The holding of *Phillips* was extended still further in *People v. Whisenand* (1995) 37 Cal.App.4th 1383, 1395–1396 [44 Cal.Rptr.2d 501]. The court there conducted a three-day hearing on victim restitution, at the conclusion of which it not only awarded restitution but also found the defendant able to pay for appointed counsel, and ordered reimbursement in the sum of $800, based on 20 hours at $40 per hour. (*Id.* at pp. 1388, 1392.) The defendant argued among other things that she had received insufficient notice of the reimbursement order, noting that in contrast to *Phillips*, there had been no reference to reimbursement in the probation report. (*Id.* at p. 1395.) The court nonetheless found the point unavailable on appeal, because "[c]ounsel did not object to the order, and did not claim surprise or lack of notice." (*Ibid.*) It cited the rule that " '[a]ppellant cannot be heard to complain of inadequate notice when, *represented by counsel*, he participated in the hearing without making any mention of his present contention or asking for time to prepare.' " (*Ibid.*, italics added, quoting *People v. Brown, supra*, 13 Cal.App.3d at p. 882.) The court alluded to the presence of counsel at the restitution hearing resulting in the reimbursement order. (*Whisenand, supra*, 37 Cal.App.4th at p. 1395.)

 We do not believe that an appellate forfeiture can properly be predicated on the failure of a trial attorney to challenge an order concerning *his own fees*. It seems obvious to us that when a defendant's attorney stands before the court asking for an order taking money from the client and giving it to the attorney's employer, the representation is burdened with a patent conflict of interest and cannot be relied upon to vicariously attribute counsel's omissions to the client. In such a situation the attorney cannot be viewed, and indeed should not be permitted to act, as the client's representative. Counsel can hardly be relied upon to contest an order when a successful contest will

directly harm the interests of the person or entity who hired him and to whom he presumptively looks for future employment.

We recognize that a particular deputy public defender might, as a salaried employee, feel personally disinterested in a reimbursement order, and might even be willing to oppose it on behalf of the defendant. The same might even be true of an appointed attorney whose claim for payment, and prospects of future employment, were wholly and securely divorced from any reimbursement order the court might make. However, the spectacle of an attorney representing a client in connection with an order requiring that client to pay for the attorney's services, however attenuated the connection may be in fact, carries the patent appearance of at least a vicarious adversity of interests. Here it went beyond mere appearance; it was defense counsel himself—the very person who was supposedly protecting defendant's rights in the matter— who brought the fee request to the court's attention, saying *"We're* asking the Court to assess attorney's fees" and *"We're* asking—the amount *we're* asking is $9,200 in attorneys fees." (Italics added.) Counsel was at that moment clearly representing his employer, whose interests were flatly contrary to defendant's. To all appearances, counsel had abandoned his erstwhile client to pursue the pecuniary interests of his boss. We express no view on the consequences of such a conflict other than to state that it is absurd to rely on the conduct of the attorney to impose a procedural forfeiture upon the client.

Nor could defendant be expected to rise to assert her own interests, at least without explicit advisements that she was now in effect appearing in propria persona and could not rely upon counsel to protect her. So far as this record shows, she may have had no idea that an order for reimbursement was on the table until her own attorney stood up at her sentencing and asked for it. She was not, at that moment, "represented by counsel" for purposes of the waiver rules on which the cited cases rely. Under these circumstances, any deficiency in notice or noncompliance with prescribed statutory procedures must be viewed as available on appeal, at least in the absence of an affirmative and unequivocal showing on the record that the client understood her pro se status, that she knew of the deficiencies in the proceeding, that she knew of her procedural rights under the statute, and that she knowingly declined to raise any of these objections or exercise any of these rights.[15] Since none of these factors was present here, none of the deficiencies defendant seeks to raise on appeal was waived by the absence of an objection below.

---

[15] Obviously this analysis has no application where the defendant has engaged independent counsel before reimbursement is ordered. (E.g., *People v. Cruz* (1989) 209 Cal.App.3d 560, 563 [257 Cal.Rptr. 417] [defendant retained private counsel for restitution issues].) Such a case would be governed by the usual principles concerning preservation of objections by a represented party. (See *id.* at p. 564.) Our remarks apply where, at the time of a reimbursement order, the defendant's sole representative is the same publicly financed counsel for whose services reimbursement is sought.

Moreover, two of defendant's contentions—and the two we here reach—go to the sufficiency of the evidence to support the order. Such a challenge requires no predicate objection in the trial court. (*People v. Butler* (2003) 31 Cal.4th 1119, 1126 [6 Cal.Rptr.3d 730, 79 P.3d 1036], quoting *Tahoe National Bank v. Phillips* (1971) 4 Cal.3d 11, 23, fn. 17 [92 Cal.Rptr. 704, 480 P.2d 320] [" 'Generally, points not urged in the trial court cannot be raised on appeal. . . . The contention that a judgment is not supported by substantial evidence, however, is an obvious exception' "].)

■■■ The order here is entirely unsupported by evidence that the amount requested by the public defender, and allowed without opposition, represents the actual costs to the county of the services provided to defendant. In *People v. Cruz, supra*, 209 Cal.App.3d at page 566, the court held that "the word 'cost' as used in section 987.8 means the cost of the legal services provided to a criminal defendant as represented by a pro rata share of the public defender's budget. In addition, 'cost' includes any proven expenses to the county established by the evidence, such as investigator's fees and expenses, expert witness fees or expenses, long distance telephone expenses, etc."[16]

Here the only supporting matter in the record is an unsigned and unverified itemization of services from the public defender's office. Essentially a bill, it claims that 46 hours were expended, and contains the added statement, "An hourly fee of $200.00 was used to reach the figure of $9,200.00." There is no assertion—let alone competent *evidence*—that $200 per hour represents the actual cost to the county of defendant's representation. (Cf. *People v. Cruz, supra*, 209 Cal.App.3d at p. 563 [public defender responded to court's questions by stating that "appellant's counsel had spent a total of 181 hours on appellant's case and that *the hourly cost to the county for this service was $62.50*" (italics added)].) It is possible that $200 does in fact represent actual cost, but in the absence of some evidence to that effect—or at least a recital by an officer of the court—there is no basis for the award under review.

There is also a dearth of evidence that defendant would be able to pay $9,200 in defense costs over the six months following the hearing. (See

---

[16] However, if the public defender's entire budget is used to determine the pro rata hourly cost, then an *additional* charge for "proven expenses" would entail a double recovery, i.e., the actual costs of such "extras" and then a pro rata share of the same items. A better formula would derive an hourly rate from the office's budget for *labor* costs, add a pro rata share of fixed office overhead (e.g., rent), and then add any additional expenses shown to have been incurred. An even more reliable determination of actual costs could be made, with seemingly minimal burden on the public defender, by deriving hourly labor costs from the *actual compensation* paid to persons working on the case. We do not decide, however, whether some such more precise approach should be required. So long as there is substantial evidence of the actual cost attributable to the case in question, an order allowing that or a lesser amount is adequately supported.

§ 987.8, subd. (g)(2)(B) ["In no event shall the court consider a period of more than six months from the date of the hearing for purposes of determining the defendant's reasonably discernible future financial position."].) Respondent contends that sufficient evidence was supplied by the probation report, which stated that defendant and her husband had purchased a $250,000 home in Temecula and that she was receiving monthly disability payments of $604. The home, however, was subject to a $245,000 mortgage. Even indulging the highly dubious supposition that defendant could extract the entire $5,000 equity this represents, and assuming she could add to it her entire disability payment, this would amount to only $8,624 over six months—still less than the $9,200 ordered.

Respondent suggests that defendant was employable in view of "her relatively young age, 55" and "the fact that she attended college in the Philippines from 1964 to 1968." Defendant was also described by the probation officer as "claim[ing]" to be in "good health." However she also said that she suffered from breathing problems, had been receiving disability benefits since 1983 on that basis, and was taking prescription medication for that condition. She reported that she had last been employed in 1971, and that, although she was "working with the Department of Rehabilitation to be 'retrained,'" she had postponed that activity "due to the pending court proceedings." We reject the suggestion that the evidence supported a reasonable expectation of gainful employment sufficient to pay the ordered amount within six months.[17]

Respondent also contends that the order is supported by evidence to the effect that defendant's husband was a veteran "presumably drawing a Navy pension" who "continued to be employed at North Island Naval Station in San Diego." Respondent's "presum[ption]" about a pension is speculation, not reasoned inference. Nor is there any indication of the husband's actual earnings, or of the couple's financial obligations. The reported equity in the couple's home hardly supports an affirmative finding that the couple could pay off a $9,200 debt in six months. This makes it unnecessary to consider whether the husband's earnings, or a portion of them, could be properly viewed as available to satisfy such an obligation. (Cf. *People v. Whisenand*, *supra*, 37 Cal.App.4th at p. 1393 [spouse's income may be properly considered as freeing defendant spouse to pay more of own income to county].)

We conclude that the reimbursement order cannot be sustained.

---

[17] Respondent also acknowledges that the court originally sentenced defendant to six months in jail, a disposition that would seemingly preclude defendant's earning *any* money over that period. Respondent asserts that the court could nonetheless anticipate a reduction of the jail term upon defendant's reconveyance of the house to Mrs. Watkins. At the time of sentencing, however, defendant was adamant about *not* reconveying the house. And even if defendant unexpectedly complied, the court anticipated a jail term of at least 30 days, which would reduce the available earnings period to no more than five months.

## DISPOSITION

The judgment of conviction is affirmed. The order for reimbursement of county defense costs is reversed for further proceedings consistent with this opinion. (See *People v. Flores* (2003) 30 Cal.4th 1059 [135 Cal.Rptr.2d 63, 69 P.3d 979].)

Premo, J., and Elia, J., concurred.

The petitions of both respondent and appellant for review by the Supreme Court were denied March 29, 2006, S140576.