Filed 4/2/13  P. v. Vanek CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>SAMUEL VANEK,<br><br>    Defendant and Appellant. | B227789<br><br>(Los Angeles County<br>Super. Ct. No. VA108590) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Lori Ann Fournier, Judge.  Affirmed in part, reversed in part and remanded with directions.

Jonathan E. Demson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven E. Mercer and Sonya Roth, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant, Samuel Vanek, appeals his conviction, after a bench trial, for felony child abuse with an enhancement for infliction of great bodily injury on a child under the age of five (Pen. Code, §§ 273a, subd. (a), 12022.7, subd. (d)).[1] Vanek was sentenced to state prison for 10 years.

The judgment is affirmed in part, reversed in part and remanded with directions.

## BACKGROUND

Viewed in accordance with the usual rule of appellate review (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established the following.

1. *Prosecution evidence.*

Cassandra's son Gabriel was born in February 2008.[2] Cassandra and her husband were serving in the military and, when they were deployed to Iraq in late April, they left Gabriel in the care of Cassandra's sister, Rebecca.

Rebecca was living with defendant Vanek at Fort Irwin. Vanek told Rebecca he was unhappy about having to take in Gabriel and he asked her, "Why did you have to take the baby; I hate babies." Gabriel slept with Rebecca, who fed and changed him. Vanek, who took no part in caring for Gabriel, became easily annoyed when the baby cried. Rebecca's eldest son, Juan, who was 12 years old at the time of trial, heard Vanek tell Rebecca: "I hate this damn baby. . . . Why did you even tell your sister that we could keep him here?"

Vanek and Rebecca moved to La Mirada over the weekend of May 24 and 25. Rebecca testified that on Monday morning, May 26, Gabriel was not feeling well. He was cranky, he only wanted to be held, and he had been sick the night before. However, his motor coordination was fine that morning and he was not having any respiratory problems. After Gabriel fell asleep on the living room couch, Vanek suggested Rebecca go out and get her nails done. When Rebecca left the house,

---

[1]     All further references are to the Penal Code unless otherwise specified.

[2]     All further date references are to the year 2008 unless otherwise specified.

Vanek was outside playing football with Rebecca's sons Juan and Devon, and her nephew Austin.

At one point, the boys went inside for a drink of water and Juan saw Vanek coming out of the bedroom carrying Gabriel, who did not look well. Vanek started to administer CPR to Gabriel and told Juan to call Rebecca. Rebecca testified that 35 or 40 minutes after she left the house, Vanek called her to come home because there was something wrong with the baby's breathing. When Rebecca asked if he had called 911, Vanek said no and that he just wanted her to come home. Rebecca rushed home to find Gabriel very pale and limp, his breathing light and shallow. She immediately called 911. When the ambulance arrived, Rebecca went with Gabriel to the hospital.

Vanek took the three boys to an ice cream store. On the way there, he asked which one of them would say he had dropped the baby. Devon agreed to take the blame; because he was the smallest of the three boys, it would make the most believable story.

At the hospital later that day, Vanek spoke to Deborah Phillipson, the social worker assigned to Gabriel's case. Vanek apologized for having coached the children to lie about dropping the baby, but said he had been afraid he would be blamed for hurting Gabriel. Vanek told Phillipson he had been outside playing with the boys while Gabriel was asleep on the living room couch. Devon went inside to get a drink and Vanek heard Gabriel crying. Devon came out, but then went inside again and stayed for about 10 minutes. When Vanek heard Gabriel crying again, he went inside to check. He moved Gabriel from the couch to the bedroom, changed his diaper, and put him in his crib. Vanek then went back outside. He returned a short time later to check on the baby and found Gabriel making weird noises. He shook Gabriel a little to wake him up. When Gabriel did not wake up, Vanek started CPR and called Rebecca to come home.

Vanek also spoke to Deputy Sheriff Francisco Campos at the hospital. Vanek said after Rebecca left the house, he was outside playing football with the boys. When Gabriel started crying, Vanek and Juan went inside to check. They moved Gabriel from the living room to his crib in the bedroom, and then went to watch television in the living room with the other two boys. When Vanek and Juan checked on Gabriel five or ten

3

minutes later, the baby was gasping for air. Vanek told Campos "he picked up the baby and placed both hands underneath his armpits and lifted the baby and shook the baby twice," and that "the second time when he shook the baby . . . he noticed the baby's head just kind of fall back and [the] baby's eyes just closed." Vanek said that both times he shook Gabriel he had done so "softly." Vanek also said he ran to the living room, put Gabriel on the sofa and called Rebecca. He briefly tried CPR, but got no response. Then Rebecca arrived and called 911. Vanek did not say anything about changing Gabriel's diaper. After the ambulance left, Vanek "told the kids that somebody had to step up and take the blame for what happened." Devon offered to do so. Vanek told Campos he asked Devon if he had dropped the baby and Devon denied it. Vanek said he then "told everybody again that somebody had to step up, and he did not want anybody to get in trouble. And he said that they agreed that Devon was going to take the blame."

Juan acknowledged having told Phillipson at the hospital that Vanek had done nothing more than gently shake Gabriel to try to wake him up. However, Juan also testified he told Phillipson this "because I was scared that he would hurt me if I said something else," and that actually Vanek had "a really hard grip" on Gabriel with both hands.

Vanek and his former wife, Sarah, have two sons. Sarah testified Vanek's volatile temper was one reason for their divorce. Once when one of the boys was about six months old, Vanek "lifted him off the ground by his arm [and] just told him to shut up" because he was crying. This incident concerned Sarah because she "never saw somebody react to a crying baby that way." Another time, when the other boy was two or three years old, he was playing outside with some neighborhood kids when he pulled a little girl's hair. Vanek "just reacted and slapped him in the head, and [his son] wobbled and then fell to the ground." Sarah got upset and yelled at Vanek. On another occasion, after finding a letter Sarah had written to a man who was in jail, Vanek "completely lost it; he " grabbed a hammer and threatened to kill her. Sarah ran outside and had her neighbor call the military police. Another time, Vanek shoved a chair at Sarah, causing her to fall

4

backward and break her elbow. Sarah told Phillipson, the social worker, that Vanek could "go from zero to hot in a matter of seconds."

Vanek, who was six foot three inches tall and weighed more than 200 pounds, had pushed Rebecca around a few times in the past. Once, when Vanek was angry at her while they were at McDonald's, "he pulled the food out of the bag and threw cheeseburgers in [Rebecca's] face." This happened in front of the children. Rebecca saw Vanek spank his own two sons with a belt when they were four and five years old, a punishment she considered excessive. Rebecca told Vanek it was unacceptable, she didn't want to see him do that again in her house, and he was not to lay a hand on her children.

On May 24, Rebecca and Vanek had gone to rent a U-haul for the move to La Mirada. Rebecca went into the office, leaving Gabriel and Vanek in the car. Gabriel was in his car seat with a bottle. Because there was a long line inside, Rebecca came back to the car to check on Gabriel. She noticed there were marks on both sides of his mouth, at the corners, which were consistent with the ring from the bottle, and also that the inside of Gabriel's mouth was a little bloody. When Rebecca asked what happened, Vanek professed to have no idea what she was talking about and said Gabriel "must have went forward and . . . hit his mouth on the bottle."

Dr. Sandra Murray, a professor of pediatrics at U.C. Irvine and interim director of the Orange County child abuse service team, examined Gabriel on May 27 at the hospital. Gabriel was in critical condition. He had sustained damage to the parts of his brain affecting vision, speech and motor skills. Although Gabriel had since showed some improvement, Murray testified he would never be able to see, walk or speak.

Murray opined Gabriel had sustained "abusive head trauma"[3] caused by a violent back-and-forth movement of his head. This violent movement could have been the result of a forceful shaking of Gabriel's body, which would have caused his brain to bounce

---

[3] Murray explained that "abusive head trauma" was the new name for shaken baby syndrome.

5

around inside his skull. The baby's injuries could not have been caused by gentle shaking, the administration of CPR, having been shaken by a six- or seven-year-old child, or Vanek's alleged revival efforts. A young child could have caused these injuries by dropping the baby, but only "from an extreme height" and there was no evidence of this given Gabriel's other injuries.

2. *Defense evidence.*

Dr. Jean Carlin testified as an expert in psychiatry. She had interviewed Vanek to determine his competency to stand trial and his mental state at the time of the incident. Based on Vanek's self-told history of having seen military action in Iraq, during which he had administered CPR to fallen comrades, and his self-reported history of subsequent psychological troubles, Carlin opined he suffered from post-traumatic stress disorder (PTSD). Someone suffering from PTSD could suffer flashbacks under certain circumstances, even in non-combat situations; the person's mindset and intent could be affected by stressful situations. Carlin also discussed an incident in which Vanek's own newborn child had suffered a serious medical condition, but Vanek could not be present because the military sent him to Kuwait. This could have affected his ability to think rationally when confronted with Gabriel's situation.

3. *Closing argument and verdict.*

After the presentation of evidence at this bench trial, the prosecutor argued to the trial court that the evidence showed it was Vanek who had injured Gabriel: "[A]ccording to the witness accounts, and by his own admission, defendant is the only person who handled Baby Gabriel from couch into the playpen. During that short trip, the baby, we know, was crying. What efforts [Vanek] made, what physical shaking, tossing, throwing the baby onto the playpen, we would not know. The only thing we know is the physical evidence. The medical evidence established that the baby suffered a violent, traumatic shaking during the time that the defendant handled the child. [¶] When the defendant indicated . . that all he did was to resuscitate the child by breathing into his mouth or gently shaking, by that time the child had already suffered global brain damage at the hands of the defendant."

6

Defense counsel argued: "The reason why we're here, Your Honor, is because both sides differ in what really happened. There is no disagreement that the child has suffered a traumatic injury. That's clear by the medical evidence. What is not so clear, contrary to what counsel believes, is what actually caused the injury. Was it an intentional act by the defendant, or was it an accidental act?" "I think if there were a violent shaking, there would have been some evidence of some bruising, because then in that anger that counsel seems to think that Mr. Vanek had towards this child, that anger would have pronounced itself in a more forceful squeezing of that child during the shaking. [¶] One of the things the doctor looked for on the baby was bruises, and there were none found. Had there been bruising present, that would have been further evidence of violence. And we don't have that. [¶] What we have here, Your Honor, is a very horrible, tragic accident. That's what we have here."

When the trial court subsequently asked the prosecutor, "So what's your theory how the victim sustained the injuries?", the prosecutor replied: "That the defendant, when he moved the child, who was crying, from the couch into the bedroom, he . . . violently shook the baby . . . shook the baby really hard to try to stop him from crying." "People believe that the defendant changed the diaper, handled the baby in many different ways, causing the baby to suffer this massive brain injury. Even hitting baby on the playpen, which is on probably a soft surface, but throwing the baby down after he violently shakes the baby to stop him from crying. And by the time the baby stops crying, he's already sustained injuries. So then he leaves out of the room, but he goes back a few minutes later to check on the baby. Why? Because he knew he had done something to the baby and wanted to make sure the baby was okay. [¶] When he got back to the baby, he could see what damage he had already done to the child, and that's when he is trying to give him CPR and other things to try to revive the baby himself because he didn't want people to find out what had happened." "This is a case of circumstantial evidence. Yes, it is true nobody saw the defendant violently shake the child, but he was the only one that was with the child during the time when these injuries occurred."

The trial court then announced the verdict: "This is a circumstantial evidence case. Mr. Vanek was the only person alone with the victim . . . who, based on Dr. Murray's testimony, could have inflicted the injuries sustained by the victim. The defendant's actions, the failure to call 911, attempting to have one of the children take the blame for the victim's injuries are evidence to the court that he inflicted the injuries. [¶] I don't find that his actions and the testimony that I heard is consistent with an accident."

## CONTENTIONS

1. The trial court erred by admitting evidence of Vanek's violent behavior toward other people.

2. The trial court erred by ordering Vanek to reimburse defense costs.

## DISCUSSION

1. *Evidence of Vanek's other violent conduct was properly admitted.*

Vanek contends the trial court erred by admitting evidence of his prior abusive and violent conduct toward persons other than the victim. This claim is meritless.

      a. *Legal principles.*

Evidence Code section 1101, subdivision (b), allows the admission of evidence of a person's uncharged misconduct "when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . .) other than his or her disposition to commit such an act."

"Subdivision (a) of section 1101 prohibits admission of evidence of a person's character, including evidence of character in the form of specific instances of uncharged misconduct, to prove the conduct of that person on a specified occasion. Subdivision (b) of section 1101 clarifies, however, that this rule does not prohibit admission of evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 393, fn. omitted.) "The categories listed in section 1101, subdivision (b), are examples of facts that legitimately may be proved by other-crimes evidence, but . . . the list is not exclusive. [Citations.]" (*People v. Catlin* (2001) 26 Cal.4th 81, 146.)

Hence, "[a]lthough evidence of prior offenses may not be introduced *solely* to prove criminal disposition or propensity such evidence may properly be admitted whenever it tends logically, naturally, and by reasonable inference to establish any fact material for the People or to overcome any material matter sought to be proved by the defense." (*People v. Montalvo* (1971) 4 Cal.3d 328, 331-332, italics added.)

" 'On appeal, the trial court's determination of this issue, being essentially a determination of relevance, is reviewed for abuse of discretion' [Citation.]" (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 203.)

        b. *Discussion*.

We conclude the trial court did not abuse its discretion by admitting the disputed evidence because it was relevant to prove Vanek's intent and the absence of mistake or accident.

By pleading not guilty, Vanek placed all elements of the charged offense of felony child abuse at issue, including the requisite intent. "Defendant's not guilty plea put in issue all of the elements of the offenses. [Citation.]" (*People v. Steele* (2002) 27 Cal.4th 1230, 1243.) This would have been true even if he had conceded, or merely not disputed, the issue of his intent. (See *People v. Jones* (2010) 51 Cal.4th 346, 372 ["Defendant argues that only identity was actually disputed at trial, and he did not dispute the perpetrator's intent to rob . . . . Even if this is so, it is not dispositive. '[T]he prosecution's burden to prove every element of the crime is not relieved by a defendant's tactical decision not to contest an essential element of the offense.' "]; *People v. Steele, supra,* at p. 1243 ["Even if [defendant conceded issue of intent to kill], the prosecution is still entitled to prove its case and especially to prove a fact so central to the basic question of guilt as intent."].)

Section 273a, subdivision (a), provides: "Any person who, under circumstances or conditions likely to produce great bodily harm or death, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of that child to be injured, or willfully causes or permits that child to be placed in a situation

9

where his or her person or health is endangered, shall be punished by imprisonment in a county jail not exceeding one year, or in the state prison for two, four, or six years."

"Violation of section 273a, subdivision (a) ' "can occur in a wide variety of situations:  the definition broadly includes both active and passive conduct, i.e., child abuse by direct assault and child endangering by extreme neglect." [Citation.]' " (*People v. Valdez* (2002) 27 Cal.4th 778, 784.)  "The language 'inflicts [on a child] unjustifiable physical pain or mental suffering' is most readily interpreted as requiring general criminal intent." (*People v. Sargent* (1999) 19 Cal.4th 1206, 1219.)  "In *Sargent* . . . we addressed the mens rea for a conviction of felony child abuse where direct infliction of unjustifiable physical pain and mental suffering was alleged.  [Citation.] In *Sargent*, the defendant had violently shaken his infant son, resulting in the child's near death.  We concluded direct infliction of unjustifiable physical pain or mental suffering, which in the context of violent shaking was essentially a battery, was a general intent crime.  [Citation.]  We noted the 'actus reus . . . is infliction of unjustifiable physical pain or mental suffering on a child,' and that the 'scienter for any crime is inextricably linked to the proscribed act or omission.'  [Citation.]  Hence, the mens rea for the crime was the intent to perform the underlying injurious act on a child." (*People v. Valdez, supra,* at p. 786.)[4]

Contrary to Vanek's argument, just because felony child abuse is a general intent crime does not mean it has no intent element.  "Section 20 provides, 'In every crime or public offense there must exist a union, or joint operation of act and intent, or criminal negligence.'  (See also § 26, subd. Five [persons incapable of committing crime include those 'who committed the act or made the omission charged through misfortune or by accident, when it appears that there was no evil design, intention, or culpable negligence'].)  Intent can be either general or specific.  'When the definition of a crime

---

[4]      *Valdez* noted "*Sargent* expressly left open the question of the appropriate mens rea for indirect infliction of harm on the child, the issue in this case." (*People v. Valdez, supra,* 27 Cal.4th at p. 786.)  *Valdez* went on to hold the mens rea for indirect abuse was criminal negligence.

10

consists of only the description of a particular act, without reference to intent to do a further act or achieve a future consequence, we ask whether the defendant intended to do the proscribed act. This intention is deemed to be a general criminal intent. . . . General criminal intent thus requires no further mental state beyond willing commission of the act proscribed by law." (*People v. Sargent, supra,* 19 Cal.4th at pp. 1214-1215.)

"Felony child abuse requires a mens rea: the defendant must willfully inflict unjustifiable physical pain or mental suffering on a child." (*People v. Sargent, supra*, 19 Cal.4th at p. 1223.) "[T]he proper burden of proof for a direct infliction situation is a general intent to willfully inflict unjustifiable physical pain; 'willfully' is defined as when someone does an act willingly or on purpose. [Citations.]" (*In re L.K.* (2011) 199 Cal.App.4th 1438, 1445.) Hence, whether Gabriel's injuries were caused *accidentally*, or whether Vanek *intended* to violently shake the baby, was a material fact in dispute. As a result, evidence showing Vanek's short temper with crying babies, and evidence of his violence toward the women and young children in his life, was admissible to prove Gabriel's injuries had not been accidental.

Vanek argues such evidence was unnecessary because the prosecution expert "clearly and unambiguously eliminated the possibility that Gabriel's injuries were the result of any accident." Not so. The question of intentional act versus accident was very much a live issue at trial.

Although Vanek did not testify, his version of events was introduced via the extra-judicial statements he made to a police officer and a social worker. Vanek told Deborah Phillipson that when he discovered Gabriel making weird noises, he shook the baby a little to try to wake him up and then started doing CPR. Vanek told Officer Campos he discovered Gabriel gasping for breath, so he picked the baby up and shook him gently twice; then, when Gabriel's head just fell back and his eyes closed, Vanek briefly tried CPR.

11

During the cross-examination of Dr. Murray, defense counsel repeatedly tried to get the witness to concede she could not rule out the possibility Gabriel's injuries had been accidental. Defense counsel did this by asking Murray the following questions: "Now, it's almost impossible to determine whether the brain injury that you found in this child was caused either from an accidental or an intentional act, fair to say?" "Well, accidents can take any form, such as a baby of this age . . . being entangled in a blanket and losing oxygen to the brain for a period of time?" "Can there be a combination of things, lack of oxygen and efforts to revive the baby that, taken together, could result in the kinds of injuries that you saw in baby Gabriel?" "Is it possible during the period of concern that a person coming upon a baby that's unresponsive would possibly shake the baby in such a way that it could, not intentionally, cause that type of injury?" "Could rough playing with a child of this age cause those types of injuries as evidenced in baby Gabriel?" "[Y]ou can't pinpoint precisely whether the injuries were sustained as a result of accidental or intentional [*sic*], can you?" "[H]ave you seen cases in your experience where initially it may have seemed like a nonaccidental situation, but then it resulted as such?"

Then, during closing argument, defense counsel explicitly argued Vanek never intended to inflict unjustifiable physical or mental suffering on Gabriel, and that whatever injuries Gabriel suffered had been accidental: "The reason why we're here . . . is because both sides differ in what really happened. There is no disagreement that the child has suffered a traumatic injury. That's clear by the medical evidence. What is not so clear, contrary to what [the prosecutor] believes, is what actually caused the injury. Was it an intentional act by the defendant, or was it an accidental act?" "What we have here, Your Honor, is a very horrible, tragic accident. That's what we have here." "It's a horrible, horrible accident."

Hence, Vanek was disputing the evidence of his mens rea, and that made the Evidence Code section 1101 evidence admissible to show he had acted intentionally and Gabriel's injuries were not accidental.

12

In *People v. Evers* (1992) 10 Cal.App.4th 588, the defendant was convicted of second degree murder and felony child abuse arising out of the death of his two-year-old stepson. The Court of Appeal held the trial court properly admitted evidence of the defendant's prior felony conviction for severely burning the child's feet, as well as evidence the defendant had previously inflicted such severe injuries on his own one-year-old daughter that she was rendered a quadriplegic: "The evidence was . . . admissible to establish Michael's injuries did not arise from accidental means. The fact that Evers had abused the children in the past was relevant to show Michael's injuries were inflicted deliberately. Evers argues the question whether Michael's death was accidental 'was not in issue.' Such assertion is not supported by the record. While Evers produced no evidence showing Michael's injuries could have occurred accidentally, defense counsel attempted to establish such fact based on the circumstantial nature of the prosecution's evidence. During closing statements, for example, counsel strongly implied Michael's injuries could have occurred from various sources and not necessarily through Evers's physical abuse." (*Id.* at p. 599; see also *People v. Whisenhunt, supra,* 44 Cal.4th at p. 204 [prior acts of child abuse, which included striking one- and three-year-olds when they whined or misbehaved, were admissible to show intent and absence of accident in the death of another child].)

We conclude the trial court did not abuse its discretion by admitting evidence showing Vanek had an extremely short temper and tended to act very violently toward the women and children in his life. This evidence was relevant to prove the intent element of felony child abuse and to counter Vanek's defense at trial that Gabriel's injuries could have resulted from an accident, rather than from intentionally inflicted child abuse.

2. *Defense cost reimbursement order was improper*.

Vanek contends there was no substantial evidence to support the trial court's order that he reimburse defense costs in the amount of $268 pursuant to section 987.8. This claim has merit. We will remand so the trial court may reconsider imposition of this fee.

13

a. *Legal principles.*

Section 987.8, subdivision (b), provides: "In any case in which a defendant is provided legal assistance, either through the public defender or private counsel appointed by the court, upon conclusion of the criminal proceedings in the trial court, or upon the withdrawal of the public defender or appointed private counsel, the court may, after notice and a hearing, make a determination of the present ability of the defendant to pay all or a portion of the cost thereof. The court may, in its discretion, hold one such additional hearing within six months of the conclusion of the criminal proceedings. The court may, in its discretion, order the defendant to appear before a county officer designated by the court to make an inquiry into the ability of the defendant to pay all or a portion of the legal assistance provided." Subdivision (e)(5) of section 987.8 provides, in pertinent part: "If the court determines that the defendant has the present ability to pay all or a part of the cost, the court shall set the amount to be reimbursed and order the defendant to pay the sum to the county in the manner in which the court believes reasonable and compatible with the defendant's financial ability."

Subdivision (g)(2) of section 987.8 provides: " 'Ability to pay' means the overall capability of the defendant to reimburse the costs, or a portion of the costs, of the legal assistance provided to him or her, and shall include, but not be limited to, all of the following: [¶] (A) The defendant's present financial position. [¶] (B) The defendant's reasonably discernible future financial position. In no event shall the court consider a period of more than six months from the date of the hearing for purposes of determining the defendant's reasonably discernible future financial position. Unless the court finds unusual circumstances, a defendant sentenced to state prison shall be determined not to have a reasonably discernible future financial ability to reimburse the costs of his or her defense. [¶] (C) The likelihood that the defendant shall be able to obtain employment within a six-month period from the date of the hearing. [¶] (D) Any other factor or factors which may bear upon the defendant's financial capability to reimburse the county for the costs of the legal assistance provided to the defendant."

14

Hence, "[s]ection 987.8 authorizes the court to order criminal defendants to pay all or part of the cost of their appointed counsel after the trial court determines the defendant has a present ability to pay.  The ability to pay includes the defendant's reasonably discernible future financial position, limited to the next six months.  (§ 987.8, subd. (g)(2)(B).)"  (*People v. Lopez* (2005) 129 Cal.App.4th 1508, 1537, fn. omitted.)  "The court's finding of the defendant's present ability to pay need not be express, but may be implied through the content and conduct of the hearings.  [Citation.]  But any finding of ability to pay must be supported by substantial evidence.  [Citations.]"  (*People v. Pacheco* (2010) 187 Cal.App.4th 1392, 1398.)

> b.  *Discussion*.

The Attorney General asserts there was substantial evidence of Vanek's ability to pay because testimony showed he had served in the United States Army for a number of years and was discharged about a year before Gabriel was injured.  The Attorney General argues this showed Vanek "had gainful employment for the years preceding his trial.  Accordingly, the trial court did not abuse its discretion in imposing a relatively small fee under section 987.8."  Vanek responds that "[n]o evidence of savings was adduced at [the] sentencing hearing, however, and respondent fails to explain how [his] employment up until a year prior to the incident . . . is relevant to his ability to pay attorney's fees.  [¶] In the absence of any reference to savings, or even to [his] income when he was employed by the military, the record is simply devoid of any indication of [his] ability to pay attorney's fees."  Vanek also argues that, "pursuant to the explicit terms of the statute, [his] prison sentence is virtually dispositive of his reasonably discernible *future* financial position . . . ."

Vanek is right.  "The specific language of section 987.8 expressly requires a finding of *present ability* to pay for defense costs."  (*People v. Nilsen* (1988) 199 Cal.App.3d 344, 350.)  Given the statutory presumption that, in the absence of "unusual circumstances, a defendant sentenced to state prison shall be determined not to have a reasonably discernible future financial ability to reimburse the costs of his or her defense" (§ 987.8, subd. (g)(2)(B)), the trial court should have evaluated Vanek's

15

financial situation before requiring him to pay. (See *People v. Viray* (2005) 134 Cal.App.4th 1186, 1218 [insufficient evidence of ability to pay defense costs despite Attorney General's argument "that defendant's husband was a veteran 'presumably drawing a Navy pension' who 'continued to be employed at North Island Naval Station in San Diego' ": the presumption "about a pension is speculation, not reasoned inference" and there was no "indication of the husband's actual earnings, or of the couple's financial obligations"].)

Hence, we will remand this matter to the trial court for a proper determination of Vanek's ability to reimburse defense costs. (See *People v. Pacheco, supra,* 187 Cal.App.4th at p. 1403 ["we will instead reverse the judgment in part and remand with directions for the superior court to follow the law and impose these fees, consistently with the applicable statutes, only on the required determination of Pacheco's ability to pay them"]; accord *People v. Viray, supra,* 134 Cal.App.4th at p. 1219 ["The order for reimbursement of county defense costs is reversed for further proceedings consistent with this opinion."]; *People v. Lopez, supra,* 129 Cal.App.4th at p. 1537 ["Since we are reversing defendant's convictions, the trial court will have an opportunity to reconsider this attorney fee award in light of our observations."].)

## DISPOSITION

The judgment is affirmed as modified and remanded with directions. The conviction is affirmed. The order for reimbursement of defense costs is reversed, and the matter is remanded to the trial court for a determination of Vanek's ability to pay.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


KLEIN, P. J.


We concur:


KITCHING, J.                                ALDRICH, J.

16