Filed 11/26/13  P. v. Arviso CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>EDWARD ARVISO,<br><br>    Defendant and Appellant. | F064626<br><br>(Super. Ct. No. MF45433A )<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Merced County.  Brian L. McCabe, Judge.

Marcia C. Levine, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez and Tiffany J. Gates, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Following a jury trial, Edward Arviso was convicted of first degree murder (Pen. Code, § 187)[1] and robbery (§ 211). The jury found true allegations that the murder was committed in the course of a robbery (§ 190.2, subd. (a)(17)(A)), that the murder was intentional and involved infliction of torture (§ 190.2, subd. (a)(18)), and that the murder was intentional and carried out for financial gain (§ 190.2, subd. (a)(1)). The jury found not true the allegation that Arviso personally used a deadly or dangerous weapon in the commission of the murder and robbery (§ 12022, subd. (b)). In a bifurcated proceeding, the jury found true that Arviso had a prior strike conviction (§ 1170.12, subd. (c)(1)). The trial court sentenced Arviso to state prison for life without the possibility of parole for the murder, stayed execution of sentence for the robbery, and imposed various fines and fees.

On appeal, we disagree with Arviso's contention that there is insufficient evidence to support the true finding on the torture special circumstance. We agree with his claims that there is insufficient evidence to support the court's order that he reimburse the county for attorney fees and that the imposed parole revocation fine is unauthorized and must be stricken. Finally, we grant his request and review the materials considered by the trial court in the in camera *Pitchess*[2] motion, but find no error.

### FACTUAL AND PROCEDURAL SUMMARY

The facts of the crime were recounted at trial by David Fagundes, who admitted during the investigation that he was involved in the murder at issue. Prior to his testimony, Fagundes entered into a plea agreement with the prosecutor in which he pled guilty to manslaughter, robbery, burglary, and false imprisonment in exchange for a 22-year sentence in state prison.

---

[1]     All further statutory references are to the Penal Code unless otherwise stated.

[2]     *Pitchess v. Superior Court* (1974) 11 Cal.3d 531.

On January 25, 2007, at approximately 4:30 a.m., Arviso and Fagundes, who had known each other for 10-11 years, picked up Arviso's wife from a truck stop in Santa Nella where she worked as a waitress. The three drove to a Valero gas station, where they bought cigarettes and coffee at approximately 5:00 a.m. Arviso and Fagundes then dropped Arviso's wife off at home.

Arviso and Fagundes discussed robbing a local bait store, the Santa Nella Market (the market), since neither was employed and both were in need of money. Their plan was to hit the clerk in the head with a wrench Arviso had in his truck, bind the clerk's hands with a zip tie Fagundes had, and force the clerk to tell them where the money was.

When the two arrived at the market at approximately 5:30 a.m., the store was already open for business. Arviso and Fagundes entered the store and found the clerk, Fahd Hussein, alone in the store. Arviso and Fagundes told Hussein they wanted to buy some minnows. While Hussein turned back toward the bait tank, Arviso hit him in the head with the wrench. Hussein fell down and Fagundes tied his hands with the zip tie. Hussein was bleeding, but still conscious.

Arviso and Fagundes told Hussein to go into the back room, which he did. Once there, Fagundes took the keys from Hussein's front pocket and Hussein told Fagundes where the money was. Fagundes then went to the front of the market, locked the front door, and mopped the area where Hussein had been struck on the head. When he finished cleaning, Fagundes took the mop back to the back room. Hussein was still alive and conscious, and he did not appear to have any additional wounds.

Fagundes left the back room and went to the front of the store where he located the money, which was wrapped in a plastic shopping bag in a drawer below the cash register. Fagundes also found some loose checks, which he put into his pocket with the cash. Fagundes also took cigarettes and the digital video recorder (DVR) that was connected to the market's security cameras.

3.

Arviso came out of the back room and Fagundes noticed blood on the tops of Arviso's shoes. Arviso exited the store and Fagundes followed, locking the door behind him. When Arviso and Fagundes got into Arviso's truck, Arviso gave Fagundes the handle of a knife. As far as Fagundes knew, Arviso did not have a knife with him when they entered the store. He did not know where the knife came from, but he had seen a case inside the market that displayed knives. The handle Arviso gave Fagundes was the same color and approximate size as those he had seen in the market. The blade of the knife was not attached to the handle. Fagundes did not ask Arviso what had happened to the blade, because he did not want to know. Fagundes suspected Arviso had killed Hussein.

Arviso and Fagundes drove to the Delta-Mendota Canal and threw the DVR, the keys, the knife handle, and the wrench into the canal. They then drove to Wal-Mart in Merced, where they each bought a pair of pants, a shirt, and shoes using cash they had stolen from the market. Fagundes changed into the new clothing and disposed of his old clothing in a dumpster at an Arco gas station.

Arviso and Fagundes then drove to an orchard approximately 15 or 20 miles east of the gas station, where Arviso burned his shoes, pants, and jacket on the ground. Arviso did not burn his hat or black t-shirt, instead throwing them down next to the burn site.

Hussein was discovered in the back room of the market later that morning and pronounced dead at the scene. When his body was discovered, his hands were still bound behind his back with a zip tie. A bloody knife blade without a handle was found underneath Hussein's body.

An autopsy revealed that Hussein suffered nine cuts and stab wounds on the left side of his head, face, and neck. The blade found underneath his body was consistent with the cuts and stab wounds. Hussein also had a blunt force injury on the top left part

4.

of his scalp, consistent with being struck in the head with a wrench. The cause of death was shock and blood loss due to multiple stab wounds.

The forensic evidence at the scene was consistent with Fagundes's description of events. Blood was discovered on the side of the large aquarium at the back of the market, there were red-brown streaks on the ground, and the fibers on the mop in the back room were reddish-brown. Two different sets of shoe prints, not Hussein's, were found at the scene. And Arviso's fingerprint was discovered on the inside of the front door of the market, on the frame six to eight inches above the push bar.

Hussein's brother, the owner of the market, confirmed that a DVR installed behind the counter was missing. A dive team recovered a DVR from the Delta-Mendota Canal, but its data was not recoverable.

Fagundes led investigators to the location where Arviso burned his clothing. The remains in the burn pile were consistent with a pair of tennis shoes and clothing. Investigators discovered Arviso's hat and black t-shirt next to the burn site. A portion of the black t-shirt tested presumptively positive for blood and testing indicated Hussein was the likely source of the blood. Further DNA testing of the hat and t-shirt indicated that Arviso was the likely source of the DNA in the hat and that he could not be eliminated as a contributor to the DNA on the t-shirt.

Also near the burn site, investigators discovered a price tag and a lighter. The price tag was determined to be for a hat sold at the Wal-Mart in Merced. A receipt of the entire transaction in which the hat was purchased also showed that a pair of men's pants, socks, and a sweatshirt were also purchased.

A series of surveillance videos further corroborated Fagundes's account of his and Arviso's movements the morning of the murder. The surveillance video from the Valero gas station showed Arviso, his wife and Fagundes arriving at approximately 5:00 a.m. The surveillance video from the Wal-Mart in Merced confirmed that Arviso and Fagundes arrived at the store at approximately 7:27 a.m. And the surveillance video from

the Arco gas station confirmed that Arviso and Fagundes arrived at approximately 8:10; Arviso was wearing the hat and black t-shirt later discovered near the burn site.

*Defense*

Sandra Keys, a first cousin to Arviso and whose sister was at one point married to Fagundes, testified that she received a telephone call from Fagundes at the end of January 2007, during which Fagundes told Keys he had beaten a man to death the previous night and asked if he could come stay with Keys in Arkansas. Fagundes also asked Keys if she would call her contacts at the Merced/Mariposa Drug Task Force and try to barter a deal for him if he turned himself in. Keys never heard from Fagundes again.

Approximately one week after the telephone call, Keys learned that Arviso was accused of being involved in the same incident. Keys attempted to contact Nathan Mancebo, a detective in Merced County, and Al Cardwood, a state-level drug enforcement officer, but could not get through to either.

Keys contacted Arviso's defense counsel two days prior to giving her testimony in the present matter. She had learned defense counsel's identity a few days earlier when she called an aunt in Los Banos and asked who was representing Arviso. According to Keys, she claimed she waited four years to contact anybody because she did not have proof of her conversation with Fagundes.

*Rebuttal*

Fagundes testified that the last time he spoke to Keys was in the late 1990's. He denied calling her in January of 2007.

## DISCUSSION

### I. SUFFICIENCY OF THE EVIDENCE

Arviso challenges the sufficiency of the evidence supporting the true finding on the torture-murder special circumstance pursuant to section 190.2, subdivision (a)(18). Specifically, Arviso argues the evidence was insufficient to establish the intent to torture as required for the special circumstance finding. Arviso argues that the only evidence of

6.

what happened during the incident came from Fagundes, and even his testimony did not establish the elements of the torture special circumstance. We disagree.

*Applicable Law and Analysis*

The prosecutor argued and the court instructed on three alternative theories of first degree murder: deliberate and premeditated murder, robbery felony murder, and torture-murder. The verdict does not specify which theory the jury relied upon in finding Arviso guilty. The prosecutor also argued and the court instructed on three special circumstance allegations: that the murder was intentional and carried out for financial gain; that the murder was committed while the defendant engaged in, or was an accomplice in a robbery; and that the murder was intentional and involved infliction of torture. Arviso contests this last special circumstance allegation.

"Under the applicable statute, first degree murder is punishable by death or life in prison if the murder 'was intentional and involved the infliction of torture.' (§ 190.2, subd. (a)(18).) Proof of a murder committed under the torture-murder special circumstance requires (1) proof of first degree murder, (2) proof that the defendant intended to kill and torture the victim, and (3) proof of the infliction of an extremely painful act upon a living victim. [Citation.] The torture-murder special circumstance thus is distinguished from first degree murder by torture in that it requires defendant to have acted with the intent to kill and applies where the death involved the infliction of torture, regardless of whether the acts constituting the torture were the cause of death." (*People v. Jennings* (2010) 50 Cal.4th 616, 647; see also *People v. Chatman* (2006) 38 Cal.4th 344, 394.) "[U]nder section 190.2, subdivision (a)(18), … the requisite torturous intent is an intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any other sadistic purpose. A premeditated intent to inflict prolonged pain is not required." (*People v. Elliot* (2005) 37 Cal.4th 453, 479, fn. omitted.)

The jury was instructed with CALCRIM No. 733, which provides that, in order to prove the special circumstance, the People must prove that Arviso: (1) intended to kill Hussein; (2) intended to inflict extreme pain and suffering on Hussein while he was still alive; (3) intended to inflict such pain and suffering on Hussein for the calculated purpose of revenge, extortion, persuasion, or any other sadistic reason; and (4) did an act involving the infliction of extreme physical pain and suffering on Hussein. The instruction further stated that there is no requirement that the person killed be aware of the pain.

We review the entire record, in the light most favorable to the prosecution, to determine whether a rational trier of fact could have found the essential elements of the torture-murder special circumstance allegation beyond a reasonable doubt. (*People v. Mungia* (2008) 44 Cal.4th 1101, 1136 (*Mungia*); see also *Jackson v. Virginia* (1979) 443 U.S. 307, 319; *People v. Osband* (1996) 13 Cal.4th 622, 690 [test for sufficiency of a special circumstance finding is the same as that for a criminal conviction].)

Here, there is ample evidence that Hussein was stabbed repeatedly after he was hit on the head and his hands tied behind his back. Dr. Robert Lawrence, the forensic pathologist who performed the autopsy on Hussein, testified that Hussein had no defense wounds, but suffered nine stab wounds in total, including two in his left cheek, one in his left temple, one near his left ear, one on the left side of his neck, one just below his left eye, and one in the region of his left eye. The deepest cut, measuring a depth of four inches, was in his eye and went through the eyeball itself. According to Dr. Lawrence, although several wounds were potentially fatal, some were not.

Arviso argues, however, that there is no evidence that these wounds suggest he acted with intent to torture. The intent to torture "is a state of mind which, unless established by the defendant's own statements (or by another witness's description of a defendant's behavior in committing the offenses), must be proved by the circumstances surrounding the commission of the offense [citations], which include the nature and

8.

severity of the victim's wounds." (*People v. Crittenden* (1994) 9 Cal.4th 83, 141) "'We have, however, cautioned against giving undue weight to the severity of the wounds' (*People v. Chatman[, supra,]* 38 Cal.4th [at p.] 390); severe injuries may also be consistent with the desire to kill, the heat of passion, or an explosion of violence." (*Mungia, supra,* 44 Cal.4th at p. 1137.)

Arviso compares his case to *Mungia* in which the court concluded there were insufficient grounds for a finding of torture-murder special circumstance. In *Mungia*, the defendant was convicted of first degree murder, and the jury found true special circumstance allegations that the murder was committed while defendant was engaged in the commission of a robbery and burglary, and that the murder was intentional and involved the infliction of torture. (*Mungia, supra,* 44 Cal.4th at pp. 1105-1106.) The victim had been beaten with a blunt instrument numerous times. She had defensive wounds on her hands, indicating she had remained conscious for a period of time. The *Mungia* court determined that "[t]he killing was brutal and savage, but there is nothing in the nature of the injuries to suggest that defendant inflicted any of them in an attempt to torture [the victim] rather than to kill her." (*Id.* at p. 1137.) In making its determination, the court considered defendant's sister's statement that defendant had told her that, if he ever committed another robbery, he would have to kill the victim to avoid being identified. It also considered the method in which the victim was killed: by repeatedly hitting her in the head with a blunt object, which the pathologist opined had occurred "'in a short period of time.'" (*Id.* at pp. 1110, 1137.)

*Mungia*, however, does not alter our conclusion that the evidence here was sufficient. Hussein was likely incapacitated by the blunt force injury to his head and having his hands tied behind his back. Along with the lack of any defensive wounds, these factors indicate he was not able to resist the attack. Nevertheless, according to Dr. Lawrence, the stab wounds ranged in depth from just under a quarter of an inch to four inches and only three of the nine stab wounds were potentially fatal, which could be

9.

interpreted to mean that Hussein did not die immediately. Some of the wounds required a considerable amount of force because they penetrated bone. From this, the jury could reasonably infer that Hussein's injuries were deliberately inflicted to torture him. (See, e.g., *People v. Bemore* (2000) 22 Cal.4th 809, 844 ["Certain nonlethal knife wounds, such as those clustered on [the victim's] flank, seem plainly calculated to cause extreme pain and to induce his cooperation"].)

We conclude from the foregoing that a reasonable jury could infer beyond a reasonable doubt that Arviso acted with intent to torture Hussein.

Arviso makes the additional argument that, because the jury found not true the allegation that he personally used a deadly or dangerous weapon during the commission of the murder, it did not believe he was the actual murderer, somehow impacting our analysis of his intent to torture under the special circumstance allegation. However, under the inconsistent verdict doctrine, the "not true" finding on the personal use enhancement does not inexorably lead to a finding that Arviso was not the direct perpetrator of the substantive offense. (*People v. Miranda* (2011) 192 Cal.App.4th 398, 405.)

Section 954 provides, in relevant part: "An acquittal of one or more counts shall not be deemed an acquittal of any other count." It is well established that, under section 954, inconsistent verdicts are allowed to stand if the verdicts are otherwise supported by substantial evidence. (*People v. Lewis* (2001) 25 Cal.4th 610, 656.) As explained in *People v. Miranda, supra,* 192 Cal.App.4th at pages 405-406:

> "'[A]ny verdict of guilty that is sufficiently certain is a valid verdict even though the jury's action in returning it was, in a legal sense, inconsistent with its action in returning another verdict of acquittal or guilt of a different offense.' [Citation.] The rule applies equally to inconsistent enhancement findings [citation], and to an enhancement finding that is inconsistent with the verdict on a substantive offense. [Citation.] In *Lewis*, the court explained, "'Sufficiency-of-the-evidence review involves assessment by the courts of whether the evidence adduced at trial could support any rational

10.

determination of guilty beyond a reasonable doubt. [Citations.] This review should be independent of the jury's determination that evidence on another count was insufficient." [Citation.]' (*Lewis, supra,* at p. 656.) 'An inconsistency may show no more than jury lenity, compromise, or mistake, none of which undermines the validity of a verdict. [Citations.]' (*Ibid.*)"

As discussed above, sufficient evidence supports the jury's finding that Arviso acted with intent to torture Hussein. The fact that the jury returned an inconsistent verdict by making a "not true" finding as to the allegation that Arviso personally used a deadly or dangerous weapon does not require reversal of his conviction on the substantive offense.

## II. COSTS FOR COURT-APPOINTED COUNSEL

At the conclusion of the sentencing hearing, the trial court ordered Arviso to pay attorney's fees and costs in the amount of $1,500. Arviso contends that the court erred in imposing, and therefore this court should strike, the attorney fee order. The People concede the issue. We will strike the attorney fee order.

The only reference in the record to attorney fees is the court's brief statement at the sentencing hearing while it was imposing various fees and fines, that Arviso pay, "… attorney's fees and costs in the amount of $1,500." The trial court did not cite the statutory basis of the order, but both parties assume it is pursuant to section 987.8.

Section 987.8 "empowers the court to order a defendant who has received legal assistance at public expense to reimburse some or all of the county's costs." (*People v. Viray* (2005) 134 Cal.App.4th 1186, 1213.) There is no dispute Arviso was provided legal assistance in the instant case at the county's expense. Under the terms of the statute, the trial court may, but only after notice and hearing, order a defendant to pay all or a portion of the costs of his legal representation if the court determines the defendant has the "present ability" to pay such costs. (§ 987.8, subd. (b).) While the finding of a present ability to pay may be implied, a section 987.8 attorney fee order cannot be upheld

11.

on appeal unless it is supported by substantial evidence. (*People v. Nilsen* (1988) 199 Cal.App.3d 344, 347.)

Arviso argues there was insufficient evidence to support the trial court's implied finding that he had the ability to reimburse the county for costs of legal representation in the amount of $1,500. The People concede, and we agree. Section 987.8 defines "'[a]bility to pay'" as a defendant's "overall" financial capacity to pay, and lists factors relevant to this determination. (§ 987.8, subd. (g)(2).) Those factors include "[t]he defendant's present financial position" (§ 987.8, subd. (g)(2)(A)); "[t]he likelihood that the defendant shall be able to obtain employment within a six-month period from the date of the hearing" (§ 987.8, subd. (g)(2)(C)); and his or her "reasonably discernible future financial position" (§ 987.8, subd. (g)(2)(B)). In determining the last of these factors, "In no event shall the court consider a period of more than six months from the date of the hearing …." (*Ibid.*) Moreover, "Unless the court finds unusual circumstances, a defendant sentenced to state prison shall be determined not to have a reasonably discernible future financial ability to reimburse the costs of his or her defense." (*Ibid.*)

Arviso was sentenced to life without the possibility of parole, less 1882 days of presentence credit, and the record contains no evidence of any "unusual circumstances" (§ 987.8, subd. (g)(2)(B)) indicating Arviso has a "reasonably discernible future financial ability to reimburse the costs of [his] defense" or that there is any "likelihood that [he] shall be able to obtain employment within a six-month period from the date of the hearing" (§ 987.8, subd. (g)(2)(C)), except for the employment opportunities prison offers.

Arviso argues that the proper disposition is to strike the attorney fee order. The People agree. We will strike the attorney fee order. We note that the attorney fee order is not listed anywhere on either abstract of judgment. With that in mind, we order that the attorney fee order be stricken from the minute order of March 27, 2012.

12.

III. PAROLE REVOCATION FINE

Arviso contends the trial court erred in imposing a fine of $10,000 pursuant to section 1202.45, which was stayed pending successful completion of parole. The People concede the issue, and we agree.

Such a fine is not applicable in cases where the defendant's sentence includes a term of life without parole. (*People v. Oganesyan* (1999) 70 Cal.App.4th 1178, 1185.) The fine should not have been imposed because Arviso was sentenced to life without the possibility of parole, and we order it stricken.

IV. *PITCHESS* MOTION

Arviso contends that the trial court erred in denying his motion for discovery of peace officer personnel records pursuant to *Pitchess* and requests that this court conduct an independent in camera review of the records to determine if the trial court improperly limited the scope of discoverable records. The People do not object to Arviso's request.

Prior to trial, Arviso filed a *Pitchess* motion. In it, he sought discovery of police personnel records of Detective Timothy McCann related to instances of misconduct. As noted by Arviso, McCann was the chief investigating officer in the case, and the integrity of the investigation depended on McCann's integrity. The trial court conducted an in camera review and determined that there were no disclosable materials found in the materials produced.

In *Pitchess, supra,* 11 Cal.3d 531, the California Supreme Court held that a criminal defendant is entitled to discovery of officer personnel records if the information contained in the records is relevant to the defendant's ability to defend against the charge. Later enacted legislation implementing the court's rule permitting discovery (§§ 832.5, 832.7, 832.8; Evid. Code, §§ 1043-1047) balanced the accused's need for disclosure of relevant information against a law enforcement officer's legitimate expectation of privacy in his or her personnel records. The Legislature concluded that a defendant, by written motion, may obtain information contained in a police officer's personnel records if it is

material to the facts of the case. (Evid. Code, § 1043, subd. (b)(3).) When presented with such a motion, the court rules whether there is good cause for disclosure to the defendant. (Evid. Code, §§ 1043, 1045.) If the court orders disclosure, the custodian of the officer's records brings to court all the potentially relevant personnel records and, in camera, the court determines whether any of the records are to be disclosed to the defense. "A trial court's ruling on a motion for access to law enforcement personnel records is subject to review for abuse of discretion." (*People v. Hughes* (2002) 27 Cal.4th 287, 330; see also *Haggerty v. Superior Court* (2004) 117 Cal.App.4th 1079, 1086, citing *People v. Samayoa* (1997) 15 Cal.4th 795, 827.)

We have received the sealed documents the trial court reviewed in conducting its *Pitchess* analysis. Having obtained those documents, we note first that the trial court complied with the procedural requirements of a *Pitchess* hearing. There was a court reporter present, and the custodian of records was sworn prior to testifying. (*People v. Mooc* (2001) 26 Cal.4th 1216, 1228, 1229, fn. 4; *People v. White* (2011) 191 Cal.App.4th 1333, 1339-1340.) The custodian of records complied with the requirement to bring all the records and submit them for the court to review and determine which documents were relevant. (*People v. Wycoff* (2008) 164 Cal.App.4th 410, 414-415.)

We also have reviewed the sealed documents and find no reversible error with regard to nondisclosure of those records. (*People v. Hughes, supra,* 27 Cal.4th at p. 330; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

## DISPOSITION

The trial court is ordered to strike the attorney fee order of $1,500 and the $10,000 Penal Code section 1202.45 fine. The trial court is directed to prepare an amended March 27, 2012, minute order and an amended April 2, 2012, abstract of judgment (CR-290), with each document reflecting these modifications. The trial court is further directed to forward a certified copy of the amended abstract of judgment to the director of

14.

the Department of Corrections and Rehabilitation.  As modified, the judgment is affirmed.

                                                _____

                                                                Franson, J.

WE CONCUR:


_____

Kane, Acting P.J.


_____

Oakley, J.*

---

\*      Judge of the Madera Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.